JACK M. FOX AND MARLISS S. FOX, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Fox v. Commissioner
Docket Nos. 3453-79; 10069-79; 10233-79; 10234-79; 10236-79; 10237-79; 10238-79; 10239-79; 10240-79; 10241-79; 10242-79; 10243-79; 10244-79; 13246-80; 13247-80; 13248-80; 21879-80; 22240-80; 22291-80; 22292-80; 22293-80; 22294-80; 22295-80; 22296-80; 22297-80; 23476-81; 23477-81; 23478-81; 23479-81; 23480-81; 23614-81; 31359-81; 974-82; 13919-82; 13920-82; 16675-83; 21394-83.
United States Tax Court
T.C. Memo 1988-570; 1988 Tax Ct. Memo LEXIS 603; 56 T.C.M. (CCH) 863; T.C.M. (RIA) 88570; December 15, 1988
*603 Ps are commodities dealers who entered into futures straddle transactions on the London Metal Exchange similar to those evaluated by this Court in Glass v. Commissioner,87 T.C. 1087 (1986), affd. sub nom. Herrington v. Commissioner,854 F.2d 755 (5th Cir. 1988), affd. sub nom. Yosha v. Commissioner,    F.2d    (7th Cir., Nov. 8, 1988), and Cook v. Commissioner,90 T.C. 975 (1988). Held, Ps' transactions were as a matter of law shams in substance despite respondent's failure to produce specific information regarding the amount of capital gains subsequently realized on closing out the second leg of the straddle. Parties stipulated, in effect, that each straddle transaction, at best, produced a nominal economic net gain. Held further, assuming arguendo that Ps are commodities dealers, section 108(b) of the Deficit Reduction Act of 1984 will not act to recharacterize the putative losses as trade or business losses. Cook v. Commissioner, supra, followed. Respondent's cross-motion for summary judgment granted. Samuel Brodsky, for the petitioners in docket Nos. 3453-79, 10069-79 and 21879-80. Elias Rosenzweig, Stanley Klein and Michael J. Weitzner, for the petitioners in all other dockets. *604 Victoria Wilson Fernandez and George H. Soba, for the respondent. NIMS
MEMORANDUM OPINION NIMS, Chief Judge: This case is before the Court on petitioners' motion for summary judgment and respondent's cross-motion for summary judgment filed pursuant to Rule 121, Tax Court Rules of Practice and Procedure, on May 1, 1987, and June 3, 1987, respectively. Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Addition to Tax
Docket No.
Year
Deficiency
Sec. 6653(a)
3453-79
1974
87,809.00
--
10069-79
1975
239,511.00
--
10233-79
1975
501,133.00
--
10234-79
1975
104,034.00
--
10236-79
1975
88,429.00
--
10237-79
1975
1,339,103.00
--
10238-79
1975
515,853.00
--
10239-79
1975
155,041.00
--
10240-79
1975
1,874,215.00
--
10241-79
1975
672,734.00
--
10242-79
1975
689,265.00
--
10243-79
1975
1,654,083.00
--
10244-79
1975
191,566.00
--
13246-80
1976
258,416.00
12,921.00
13247-80
1976
79,839.00
3,992.00
13248-80
1976
16,832.00
842.00
21879-80
1976
459,735.00
--
22240-80
1976
720,918.00
--
22291-80
1976
2,684,599.00
--
22292-80
1976
982,189.00
--
22293-80
1976
205,152.00
--
22294-80
1976
871,515.00
--
22295-80
1976
2,062,269.00
--
22296-80
1976
664,905.00
--
22297-80
1976
616,521.00
--
23476-81
1977
6,211,615.00
--
23477-81
1977
532,023.00
--
23478-81
1977
2,279,247.00
--
23479-81
1977
8,251,560.00
--
23480-81
1977
364,896.00
--
23614-81
1977
4,384,235.00
--
31359-81
1977
301,742.50
--
974-82
1977
724,640.58
--
13919-82
1978
195,019.00
--
13920-82
1978
161,366.00
--
16675-83
1977
82,626.00
--
1978
39,613.00
--
1979
5,313.00
--
21394-83
1978
87,606.00
--
1979
205,160.00
--
1980
74,953.00
--
*605 After concessions, [2] the sole issue for decision is whether the per se profit motivation rule section 108(b)[3] of the Tax Reform Act of 1984 (Division A of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 630), as amended by section 1808(d) of the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2817) (hereinafter section 108), applies to protect dealers from a finding that their straddle transactions are shams devoid of economic substance. BACKGROUND At the time their petitions were filed, the States of residence of the respective petitioners were as follows: States of
Name
Residence
Reed and Audrey I. Clark
New York
Ralph and Jean Kazi
New York
Jack M. and Marliss S. Fox
Hawaii
Terence J. and Jean Horn
New York
Dwight B. and Joann V. Massey
New Jersey
Joseph L. and Evelyn Fraites
New Jersey
Dominick and Jean Cademartori
New York
Daniel and Judith Gutman
New York
Hilary and Judith Gardner
New York
Charles and Joan Falk
New York
Charles and Barbara Lerman
New Jersey
Arturo Sterling
New York
*606 All of the petitioner-wives are parties to these proceedings only by virtue of their filing joint returns with petitioner-husbands. All of the petitioner-husbands (hereinafter petitioners) were associated with Czarnikow-Rionda Company, Inc., a subchapter S corporation, Czarnikow-Rionda Trading Company, Inc. or Rionda de Pass Ltd. (hereinafter referred to collectively as "Rionda"). During the years in issue, Rionda was a member of the New York Coffee and Sugar Exchange (Exchange). The Exchange is now known as the New York Coffee, Sugar and Cocoa Exchange. The Exchange has been designated as a contract market by the Commodity Futures Trading Commission (CFTC) and Rionda was registered as a futures commission merchant with the CFTC. During the years at issue, Rionda regularly traded in physical sugar, sugar futures and options on sugar futures for its own account. It also acted as a broker in the purchase and sale of sugar futures and options on sugar futures. These transactions took place on the Exchange as well as on foreign exchanges. Various petitioners were shareholders or officers of Rionda. Each petitioner was registered with the CFTC as an employee of Rionda. Petitioners *607 Clark, Fraites, Falk and Massey were members of the Exchange during the years in issue, although Exchange rules may have limited full exercise of their membership privileges. Petitioner Gardner became a member of the Exchange in April, 1976. At all times during the years in issue, Rionda maintained substantial positions in physical sugar and in sugar futures contracts on the Exchange. On a daily basis it purchased and sold sugar future contracts on the Exchange. Petitioners Clark, Fraites, Massey, Falk, Gardner, Sterling, Gutman, Horn, Lerman and Kazi participated in the decision-making processes of Rionda's business and executed futures trades on a directed or discretionary basis for customers of Rionda. The issue for decision did not, however, arise from petitioners' option trading activities on behalf of Rionda. Rather, the issue before us concerns the consequences of various silver and tin option and future straddles which petitioners transacted on the London Metal Exchange (LME). Petitioners traded silver options and futures through Lonconex and tin option and futures through Bear Stearns on the LME. Petitioners' straddle transactions were designed to produce ordinary losses *608 in the initial year and short-term capital gains in the subsequent years. The short-term capital gains would then be converted into long-term capital gains through executing new futures straddles in silver, copper and other commodities on other domestic or foreign exchanges. Petitioners have stipulated that the London options transactions at issue in this case are of the same type as those described by the Court in "Section III A" of its Findings of Fact in Glass v. Commissioner,87 T.C. 1087, 1104-1106 (1986), affd. sub nom. Herrington v. Commissioner,854 F.2d 755 (5th Cir. 1988), affd. sub nom. Yosha v. Commissioner,    F.2d    (7th Cir., Nov. 8, 1988): III. The London Options Transactions A. In General We turn now to a description of the actual transactions at issue in these consolidated cases. As previously noted, a typical London options transaction took place over a 2-year period in the form of either an option straddle or an option hedge. An option-straddle transaction, 11 the more prevalent trading strategy, was initiated by the following combination of trades in the first year of the transaction: (1) An option straddle was put on, consisting of the simultaneous purchase *609 and sale (grant) of either a call or put option (or both), for identical quantities of the same commodity with different delivery dates; and (2) A futures straddle was also put on, consisting of the simultaneous purchase and sale of futures contracts for identical quantities of the same commodity with different delivery dates. Shortly after the option straddle was put on, the legs would be closed out through the purchase and sale of identical offsetting positions. The premium (purchase price) paid to buy an offsetting option which closed out the sold (granted) option would exceed the premium that had been received on the granted option, resulting in an overall net loss on the sold option leg of the straddle. Conversely, the premium received on the sale of an offsetting option which closed out the purchased option would exceed the premium that had been paid for the purchased option, resulting in an overall net gain on the purchased option leg of the straddle. The net loss and gain, which were approximately equal, would be reported as an ordinary loss and short-term capital gain for the first year of the transaction. Since the expected tax result in the first year was generally an *610 ordinary loss, such loss could be used to offset ordinary income from unrelated sources. Next, in a switch transaction, the so-called loss leg of the futures straddle would be closed out through the purchase (or sale) of an identical offsetting position and replaced by a new position with a different delivery date. (Because an inverse relationship normally exists between the legs of a futures straddle, one leg will have an unrealized loss while the other will have an unrealized gain.) The net loss on the closed leg of the futures straddle would be reported as a short-term capital loss in the first year of the transaction and would approximately equal the short-term capital gain incurred on closing out the purchased option position. The final step of a typical option-straddle transaction occurred in the subsequent year, although not earlier than 6 months after the switch. Both legs of the futures straddle would be closed out by offsetting trades, resulting in a gain approximately equal to the loss incurred on the switch transaction in the previous year. The gain incurred would be reported as either a short-term or long-term capital gain in the second year of the transaction. The *611 second trading strategy employed by broker-dealers was the option-hedge transaction. In an option-hedge transaction, the sale of a call and/or put option was hedged by the purchase of a futures contract (to hedge the call) and/or the sale of a futures contract (to hedge the put). Shortly thereafter, the option positions would be closed out at a net loss through the purchase of an identical offsetting call and/or put option. Simultaneously with the purchase of the closing option positions, futures contracts would be executed to hedge the previously purchased and/or sold futures, thus forming one or more futures straddles. Finally, in the following year, the futures straddles would be closed out at a gain approximately equal in amount to the loss incurred on the sold options. Because both the option-straddle transaction and the option-hedge transaction strategies resulted in a capital gain in the second year of the transaction, many petitioners attempted to defer the gain (and possibly convert it into long-term gain) to the subsequent year by engaging in a rollover transaction. A rollover transaction simply entailed putting on another futures straddle in the second year of the transaction, *612 subsequently closing out the loss leg in a switch, and then closing out the straddle at a gain in the following year. 11 The term "option-straddle transaction" as used herein denotes a type of trading strategy based upon the use of both options and futures contracts. The term is to be distinguished from the term "option straddle" which is simply a straddle consisting of option contracts. Petitioners reported the following ordinary losses from their London options transactions, which respondent disallowed: Petitioner
1975
1976
1977
Clark
($ 2,124,000)
$ 3,408,382)
--
Kazi
($   518,000)
($   971,754)
($ 202,320)
Fox
($   263,913)
($   606,564)
--
Horn
--
($   140,975)
($ 155,118)
Massey
($   608,000)
($   970,195)
--
Fraites
($ 2,016,000)
($ 2,480,548)
--
Cademartori
($   127,260)
($   306,367)
($  28,986)
Gutman
--
($   140,172)
--
Gardner
($   767,752)
($ 1,014,768)
($ 755,914)
Falk
($   767,752)
($ 1,014,768)
($ 755,914)
Lerman
--
($   195,168)
--
Sterling
($   607,000)
($   882,000)
--
DISCUSSION Petitioners' motion for summary judgment is premised upon the fact that they were dealers in commodities within the meaning of section 108(b) at the time they executed their straddle transactions, a difference they believe critical in distinguishing *613 their situation from that of the nondealers we addressed in Glass v. Commissioner, supra. Respondent, however, fails to concede that petitioners were dealers within the meaning of section 108(f) and Internal Revenue Code (I.R.C.) section 1402(i)(2)(B). We are unable to establish from the stipulated facts that petitioners were "person[s] who [were] actively engaged in trading [I.R.C.] 1256 contracts and [were] registered with a domestic board of trade which is designated as a contract market by the Commodities Futures Trading Commission" during the years at issue. I.R.C. section 1402(i)(2)(B) and section 108(f). Therefore, petitioners' dealer status, a fact material to petitioners' position, remains in dispute. Because this Court may only grant summary judgment if "there is no genuine issue as to any material fact," we must, as petitioners concede on brief, deny petitioners' motion. Rule 121(b). See Naftel v. Commissioner,85 T.C. 527, 529 (1985). Respondent's cross-motion for summary judgment is based upon the legal theory that irrespective of whether petitioners are dealers or nondealers, the straddle transactions in question are shams devoid of economic substance. He asserts *614 that since the purported transactions are shams in substance, the per se rule of section 108(b) does not apply to petitioners. Therefore, the ordinary losses generated by the straddle transactions should be disallowed for tax purposes as a matter of law. For purposes of evaluating the merit of the sham in substance theory, respondent concedes that petitioners were dealers within the meaning of section 108 and that the transactions factually occurred. Thus, there remains no genuine issue of material fact with respect to the issue of sham in substance. Respondent, however, continues to contest petitioners' dealer status and the factual occurrence of the straddle transactions in all contexts other than that of his legal theory. See McLain v. Commissioner,67 T.C. 775, 778-779 (1977), and cases cited therein. Accordingly, the scope of our inquiry is limited to (1) whether petitioners' straddle transactions were shams in substance as a matter of law and if so, (2) assuming petitioners' dealer status, whether the per se presumption of section 108(b) will nonetheless act upon the putative losses arising from such transactions to characterize them as deductible "trade or business related." *615 In Cook v. Commissioner,90 T.C. 975 (1988), this Court recently considered the impact of section 108(b) on commodities dealers who engage in straddle transactions which are devoid of economic substance. In our opinion, we specifically disallowed the deduction of putative losses incurred in the Glass straddle transactions by taxpayers who qualified as dealers within the meaning of section 108(f). 90 T.C. at 976-977. We believe that the principles we establish in Cook require us to grant respondent's cross-motion for summary judgment. We note at the outset that because the parties submitted their briefs prior to our entering the Cook decision, many of the assertions they now advance are identical to those previously evaluated and answered by the Court in Cook. Rather than repeat the detailed reasoning of Cook at this time, we feel it sufficient to limit our summary to those points petitioners reassert in opposition to the cross-motion presently before this Court. We begin our analysis by considering whether the transactions in question are shams in substance. Unlike the taxpayers in Cook, who consistent with our holding in Glass stipulated that the straddle transaction at issue was *616 a sham in substance (90 T.C. at 979-980), petitioners have not explicitly conceded this point. Therefore, we must examine the stipulated facts to determine the presence or absence of economic substance. Specifically, we must determine whether the transactions at issue in this case, which were stipulated to be of the same type as those described by the Court in Glass, are distinguishable from transactions we have previously found to lack economic substance. As we stated in Glass v. Commissioner,87 T.C. at 1174, the grand focus of our attention is the entire tax straddle scheme and not each separate straddle. See Smith v. Commissioner,78 T.C. 350, 390-391 (1982). The stipulation submitted by the parties contains detailed information regarding the losses allegedly generated by closing out the "loss legs" of the various straddles. We are, however, somewhat troubled by the parties' failure to introduce into the stipulation specific information regarding the offsetting capital gain legs of the straddle transactions. Given the mandate that we view the factual materials presented and omitted and the inferences to be drawn from such materials and omissions in the light most favorable to *617 the party opposing the motion in determining the absence of a material fact ( Jacklin v. Commissioner,79 T.C. 340, 344 (1982)), it might be argued that the omission of capital gain information raises a material issue of fact that would prevent us from concluding as a matter of law that petitioners' transactions were shams in substance. We do not, however, consider respondent's failure to produce a specific record of the offsetting straddle gains to be fatal. On the contrary, because petitioners stipulated that the capital gain incurred on closing out the second leg of the straddles was "approximately equal to the loss incurred * * * in the previous year," any inference we must make regarding the amount of petitioners' capital gains must be limited to an amount which would approximately offset the losses incurred on the prior straddle leg. We conclude, therefore, that whatever petitioners' actual gains were, they must by virtue of petitioners' stipulation necessarily fall within the parameters of the straddle transactions we found in Glass and Cook to be prearranged and shams in substance. The fact that the entire transaction produces a nominal net gain, an inference we draw in *618 favor of petitioners, will not impute substance into an otherwise sham transaction. On the contrary, we specifically observed in Glass that a "very small" net economic gain might result from the closed straddle transaction (87 T.C. at 1157). However, after comparing the potential nominal economic gains with the prearranged and "very substantial" tax losses anticipated in the first year of the straddle, we concluded that the Glass transactions lacked economic substance. The parties have stipulated that petitioners' straddle transactions are similar to the generic transactions executed in Glass. We find no salient distinction in petitioners' transactions which would cause us to alter the characterization we affixed in Glass. Accordingly, we find as a matter of law that petitioners' transactions are devoid of economic substance. Our inference that petitioners' closed-out straddle produced nominal if any economic gain is consistent with the conduct the parties demonstrated in motioning this Court for summary judgment. Petitioners' dockets were removed from the trial calendar based upon the representation that the remaining controversies at issue therein could be resolved by our determining *619 the narrow legal issue of "whether the holding of Glass applied to persons who were dealers under Section 108(b)." Because the parties stipulated that their transactions were similar to the generic Glass transactions, we believe they implicitly represented that their transactions, at best, produced only nominal gains. The extent to which the parties referred to Glass in their arguments persuades us that they thoroughly examined and understood the transactions involved therein. One would expect that if significant net economic gains -- straddle gains minus straddle losses minus commissions -- were generated by petitioners' transactions, petitioners' counsel would have brought this fact to our attention in the stipulation. No such distinguishing representation was made. We are therefore convinced that our inference regarding the extent of petitioners' economic gains comports with economic realities. We next consider whether petitioners' assumed dealer status will trigger the application of section 108(b) to transmute putative losses into bona fide losses incurred in a trade or business. Like the taxpayers in Cook, petitioners place heavy emphasis upon our opinion in King v. Commissioner,87 T.C. 1213 (1986) *620 (Court reviewed), an opinion entered after Glass and prior to Cook. Marlowe King was a registered member of the Chicago Mercantile Exchange (CME), a domestic board of trade subject to regulation by the Commodities Futures Trading Corporation (CFTC). King was a commodities dealer within the meaning of I.R.C. section 1402(i)(2)(B) and section 108(f). King entered into various gold straddles during 1980 and 1981. King liquidated the loss legs of these straddles in 1980 and deducted a $ 1,452,900 short-term capital loss. The Commissioner disallowed the loss. He asserted in the statutory notice of deficiency that "The transactions at issue were either shams or devoid of the substance necessary for recognition for federal income tax purposes." 87 T.C. at 1216. King petitioned this Court for a summary judgment ruling that the claimed losses were deductible under section 108. King's affidavit in support of his motion detailed facts supporting the bona fide nature of his trading in gold contracts. 87 T.C. at 1217. The Commissioner opposed this motion on three grounds: (1) Taxpayer failed to address the threshold issue of whether the transactions were shams; (2) Taxpayer failed to show *621 that he is entitled to the presumption under section 108(b) of the Tax Reform Act of 1984 and Temporary Regulation Section 1.165-13T; and (3) Even if taxpayer were entitled to the presumption, a trial would nevertheless be required to resolve the "for profit" issue which is inherently factual. 87 T.C. at 1216. The Commissioner, however, failed to allege or support any facts tending to demonstrate that King's trading transactions were shams in any sense. We held that "Under these circumstances, respondent has not shown that there is a genuine issue of sham for trial." 87 T.C. at 1217. We then granted King's motion for summary judgment based upon a finding that the specific gold straddles executed by King were not fictitious. Petitioners assert that "The King analysis teaches that the 'economic sham' of Glass is inapplicable to taxpayers who qualify as dealers under Section 108." Petitioners misread our analysis. As we pointed out in Cook (90 T.C. at 982), we expressly refrained in King from drawing any conclusions as to what the result might be under other circumstances. In footnote 8, page 1219, of King, we said: The per se rule of sec. 108(b) would not preclude us from finding *622 for respondent in another case. The legislative history of the provision makes clear that it was not intended to apply "where the trades were fictitious, prearranged, or otherwise in violation of the rules of the exchange in which the dealer is a member." H. Rept. 99-426, at 911 (1985). [1986-3 C.B. (Vol. 2), at 911.] See also DeMartino v. Commissioner,T.C. Memo. 1986-263 [affd.    F.2d    (2d Cir., Nov. 23, 1988)]. In contrast with his unsupported allegation of sham in King, the Commissioner specifically alleged in Cook (90 T.C. at 980) that the prearranged and fictitious nature of the Glass straddles caused the transactions to be shams in substance. After assuming the Glass transactions were not fictitious, we concluded that they were nonetheless prearranged. We then concluded that Congress never intended section 108(b) to automatically characterize all dealer derived straddle losses as losses incurred in a trade or business. Rather, we determined that Congress contemplated that "the presumption [that a straddle loss was incurred in a trade or business] would not be available in any cases were the trades were fictitious, prearranged, or otherwise in violation of the rules of *623 the exchange in which the dealer is a member." 90 T.C. at 984 citing H. Rept. 99-426, 1986-3 C.B. (Vol. 2) 911. Consistent with this Congressional intent, we held that: it is appropriate before applying the per se rule of section 108(b) to enquire whether straddle transactions were fictitious, prearranged, or otherwise in violation of the rules of the exchange, and if so, whether there were losses actually incurred. [Footnote ref. omitted.] Since the straddle transactions in Glass were prearranged, causing the transactions to lack economic substance, petitioner incurred no losses to which the per se rule can be applied. * * * [90 T.C. at 986.] As discussed above, petitioners stipulated that their straddle transactions were similar to the generic Glass schemes we found to be prearranged and shams in substance. See Cook v. Commissioner,90 T.C. at 985-986. Accordingly, we find as a matter of law that petitioners' straddle transactions produced no losses to which the per se rule of section 108(b) can be applied. See DeMartino v. Commissioner,    F.2d    (2d Cir., Nov. 23, 1988), affg. T.C. Memo. 1986-263 (holding that the Court may inquire into the economic substance of a dealer's *624 commodity trading in determining whether section 108(b) is applicable). Likewise, since the straddle transactions were shams, gains reported by petitioners in the latter years do not constitute taxable income to them. To reflect the foregoing, Appropriate orders will be issued and decisions will be entered under Rule 155 in docket Nos. 3453-79, 10069-79, 10233-79, 10234-79, 10236-79, 10237-79, 10238-79, 10239-79, 10240-79, 10241-79, 10242-79, 10243-79, 10244-79, 13246-80, 13247-80, 13248-80, 21879-80, 22240-80, 22291-80, 22292-80, 22293-80, 22294-80, 22295-80, 22296-80, 22297-80, 23476-81, 23477-81, 23479-81, 23614-81, 31359-81, 974-82, 13919-82, 13920-82, 16675-83.
APPENDIX A
Section 108 of Division A of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 630, as amended by section 1808(d) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2817. SEC. 108. TREATMENT OF CERTAIN LOSSES ON STRADDLES ENTERED INTO BEFORE EFFECTIVE DATE OF ECONOMIC RECOVERY TAX ACT OF 1981. (a) GENERAL RULE. -- For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions -- (1) which are entered into before 1982 and form part of a straddle, *625 and (2) to which the amendments made by title V of such Act [Economic Recovery Tax Act of 1981] do not apply, any loss from such disposition shall be allowed for the taxable year of the disposition if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business. (b) LOSS INCURRED IN A TRADE OR BUSINESS. -- For purposes of subsection (a), any loss incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business. (c) NET LOSS ALLOWED. -- If any loss with respect to a position described in paragraphs (1) and (2) of subsection (a) is not allowable as a deduction (after applying subsections (a) and (b)), such loss shall be allowed in determining the gain or loss from dispositions of other positions in the straddle to the extent required to accurately reflect the taxpayer's net gain or loss from all positions in such straddle. (d) OTHER RULES. -- Except as otherwise provided in subsections (a) and (c) and in sections 1233 and 1234 of such Code, the determination of whether there is recognized gain or loss with respect to a position, *626 and the amount and timing of such gain or loss, and the treatment of such gain or loss as long-term or short-term shall be made without regard to whether such position constitutes part of a straddle. (e) STRADDLE. -- For purposes of this section, the term "straddle" has the meaning given to such term by section 1092(c) of the Internal Revenue Code of 1954 as in effect on the day after the date of the enactment of the Economic Recovery Tax Act of 1981, and shall include a straddle all the positions of which are regulated futures contracts. (f) COMMODITIES DEALERS. -- For purposes of this section, the term "commodities dealer" means any taxpayer who -- (1) at any time before January 1, 1982, was an individual described in section 1402(i)(2)(B) of the Internal Revenue Code of 1954 (as added by this subtitle), or (2) was a member of the family (within the meaning of section 704(e)(3) of such Code) of an individual described in paragraph (1) to the extent such member engaged in commodities trading through an organization the members of which consisted solely of -- (A) 1 or more individuals described in paragraph (1), and (B) 1 or more members of the families (as so defined) of such individuals. *627 (g) REGULATED FUTURES CONTRACTS. -- For purposes of this section, the term "regulated futures contracts" has the meaning given to such term by section 1256(b) of the Internal Revenue Code of 1954 (as in effect before the date of enactment of this Act). (h) SYNDICATES. -- For purposes of this section, any loss incurred by a person (other than a commodities dealer) with respect to an interest in a syndicate (within the meaning of section 1256(e)(3)(B) of the Internal Revenue Code of 1954) shall not be considered to be a loss incurred in a trade or business. Footnotes
1. Cases of the following petitioners are consolidated herewith: Reed Clark and Audrey I. Clark, docket Nos. 10240-79, 22291-80 and 23479-81; Ralph G. and Jean Kazi, docket Nos. 10233-79, 22296-80 and 23478-81; Jack M. Fox and Marliss S. Fox, docket Nos. 10069-79 and 21879-80; Terence J. Horn and Jean Horn, docket Nos. 10236-79, 13248-80 and 16675-83; Dwight B. Massey and Joann V. Massey, docket Nos. 10241-79, 22297-80 and 23614-81; Joseph L. Fraites and Evelyn S. Fraites, docket Nos. 10243-79, 22295-80 and 23476-81; Dominick A. Cademartori and Jean E. Cademartori, docket Nos. 10244-79, 22293-80, 23480-81 and 21394-83; Daniel Gutman and Judith Gutman, docket Nos. 10234-79 and 13247-80; Hilary P. Gardner and Judith C. Gardner, docket Nos. 10238-79, 22240-80 and 31359-81; Charles H. Falk and Joan A. Falk, docket Nos. 10242-79, 22292-80, 974-82 and 13920-82; Charles S. Lerman and Barbara Lerman, docket Nos. 10239-79 and 13246-80; Arturo Sterling, docket No. 10237-79; Arturo Sterling and Lydia Sterling, docket Nos. 22294-80, 23477-81 and 13919-82.↩
2. Three cases, docket Nos. 23478-81, 23480-81 and 21394-83 also involve unrelated issues. "Piggyback" agreements have been entered into regarding these issues so that we need not consider them at this time. All other adjustments have been resolved. ↩
3. See Appendix A for text of section 108↩ of Division A of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 630, as amended by section 1808(d) of the Tax Reform Act of 1986, Pub. L. 99-514. 100 Stat. 2085, 2817.