Charles S. LERMAN and Barbara Lerman, Cross–Appellants at No. 90–1835 Appellees at No. 90–1813,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellant at No. 90–1813 Cross–Appellee at No. 90–1835.

Joseph L. FRAITES and Evelyn Fraites, Cross–Appellants at No. 90–1836 Appellees at No. 90–1814,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellant at No. 90–1814 Cross–Appellee at No. 90–1836.

Dwight B. MASSEY and Joann V. Massey, Cross–Appellants at No. 90–1837 Appellees at No. 90–1815,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellant at No. 90–1815 Cross–Appellee at No. 90–1837.

Nos. 90–1813 to 90–1815 and 90–1835 to 90–1837.

United States Court of Appeals, Third Circuit.

Argued June 6, 1991.

Decided July 17, 1991.

Elias Rosenzweig (argued), Stanley Klein, Michael Weitzner, Brauner, Baron, Rosenzweig, Kligler, Sparber, Bauman & Klein, New York City.

Shirley D. Peterson, Asst. Atty. Gen., Kenneth L. Greene (argued), Gary R. Allen, Kimberly S. Stanley, U.S. Dept. of Justice, Tax Div., Washington, D.C.

Before SLOVITER, Chief Judge, and GREENBERG and HIGGINBOTHAM, Circuit Judges.

OPINION OF THE COURT

GREENBERG, Circuit Judge.

*Introduction*

This case involves the continuing saga of a crackdown by the Commissioner of Internal Revenue on a tax shelter device we will call the "option-straddle transaction" and the divers attempts of various taxpayers to avoid the consequences of this crackdown.

The particular straddle transactions involved silver options on the London Metals Exchange. Appellant-taxpayers, Charles S. Lerman, Joseph L. Fraites, and Dwight B. Massey, who on this appeal are assumed to be commodities dealers, engaged in the transactions on the Exchange, and deducted losses, for 1975, 1976, and 1977 purportedly incurred in those transactions. The Commissioner disallowed the deductions and assessed deficiencies against them. The appellants sought a redetermination of the deficiencies in the Tax Court, and both sides moved for summary judgment.

The Tax Court granted the Commissioner's motion, holding that the transactions were devoid of economic substance and therefore created no "loss" for which a deduction could be based. *Fox v. Comm'r,* 56 T.C.M. (CCH) 863 (1988). The Tax Court rejected the appellants' argument that, because they were commodities deal-

ers, section 108(b) of the Deficit Reduction Act of 1984, Pub.L. No. 98–369, § 108(b), 98 Stat. 494, 630, *as amended by* the Tax Reform Act of 1986, Pub.L. No. 99–514, § 1808(d)(2), (4), 100 Stat. 2085, 2817–18, *reprinted at* I.R.C. (26 U.S.C.) § 1092 note (1988) (hereinafter "section 108(b)"), countenanced the deductions. Section 108*(a)* provides that "any loss" "form[ing] part of a [pre–1982] straddle" "shall be allowed" "if such loss is incurred in a trade or business" *or* "if such loss is incurred in a transaction entered into for profit though not connected with a trade or business." I.R.C. § 1092 note (section 108(a)). Section 108*(b)* provides an irrebuttable presumption that any straddle-related *"loss* incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business." *Id.* (section 108(b)) (emphasis added). The Tax Court held that the irrebuttable trade-or-business-loss presumption of section 108(b) is inapplicable to sham transactions devoid of economic substance, and thus cannot justify the deductions.

▮ We agree. If a transaction is devoid of economic substance—as the transactions involved here undeniably were—, it simply is not recognized for federal taxation purposes, for better or for worse. This denial of recognition means that a sham transaction, devoid of economic substance, cannot be the basis for a deductible "loss." Section 108, then, which allows deductions for *losses* incurred pursuant to straddle transactions, is inapplicable to straddle transactions devoid of economic substance as there is no "loss" to which the presumption provided by section 108 can apply.

The Tax Court had jurisdiction pursuant to I.R.C. §§ 6214(a), 7442. We have jurisdiction to review final decisions of the Tax Court pursuant to 28 U.S.C. § 1291, and I.R.C. § 7482(a). Inasmuch as the appellants resided in New Jersey at the time of the filing of their respective petitions to the Tax Court, venue for these appeals lies in this court pursuant to I.R.C. § 7482(b)(1)(A). Timely notices of appeal were respectively filed by the taxpayers and the Commissioner.[1]

## I.

### *Facts/Procedural History*

The underlying facts of this case are essentially not in dispute. Each appellant claims to be a "commodities dealer" as that term is used in the Code,[2] and each seeks to deduct losses incurred as a result of dealings in option-straddle transactions engaged in through brokers operating on the London Metal Exchange in 1975, 1976 and 1977.[3] In a prior, unrelated case, *Glass v. Comm'r,* 87 T.C. 1087 (1986), which we discuss in further detail *infra,* the Tax Court held that the London option-straddle transactions are shams, lacking in economic substance. The petitioners in *Glass* were therefore denied the deductions they claimed as "losses" incurred from the transactions. 87 T.C. at 1177. Significant-

1. The Commissioner, in appeals filed "for protective purposes only," asserts that if this court holds that the taxpayers are entitled to the deductions disallowed by the Tax Court, the appellants are required to offset their claimed losses with corresponding gains reported in the subsequent years of the transactions at issue. In light of our disposition, we do not reach the issue asserted by the Commissioner's appeals.

2. *See* I.R.C. § 1092 note (section 108(f)) (1988) (cross-referencing I.R.C. § 1402(i)(2)(B)); I.R.C. § 1402(i)(2)(B) (1988) (defining "commodities dealer"). Appellants' spouses are parties to these proceedings only by virtue of the filing of joint tax returns. *Fox v. Comm'r,* 56 T.C.M. at 865.

3. Title V of the Economic Recovery Tax Act of 1981 ("ERTA") essentially eliminated the tax benefits of straddle transactions. *See* I.R.C. §§ 1256, 1092 (1988). Essentially, these provisions provide that: (1) regulated futures contracts held by the taxpayer at the close of the year are treated as having been sold on the last business day of the taxable year, with any resulting gain or loss recognized for tax purposes; and (2) losses from other commodity straddles will be recognized only to the extent that such losses exceed unrealized gain on the offsetting position of the straddle. *See Miller v. Comm'r,* 836 F.2d 1274, 1276 n. 1 (10th Cir.1988). By forcing a year-end framework on the straddle transactions, ERTA prevents the two-year period required by straddles to create apparent losses. We discuss the workings of the straddle transactions in further detail *infra.*

ly, however, the *Glass* court stated that, "[t]he case before us does not involve commodities dealers." *Id.* at 1167.

The parties here stipulated that the "London options transactions at issue in this case are of the same type as those described by the Court in *Glass et al. v. Commissioner*, 87 T.C. No. 68 (Nov. 17, 1986) in the Court's Findings of Fact, Section III A." They thus agree, *per Glass*, that the transactions in this case were shams, lacking economic substance. Appellants nonetheless moved before the Tax Court for summary judgment, arguing that as commodities dealers they should be permitted to deduct the losses pursuant to section 108(b). Appellants contended that, because they are commodities dealers, under section 108(b) they are presumed to have incurred the straddle-generated losses in a trade or business, and that the transactions in which they engaged therefore cannot be classified as shams devoid of economic substance. They argued that their case was distinguishable from *Glass*, which did not involve commodities dealers. The Commissioner, however, refused to concede that appellants were dealers and the Tax Court held that "[w]e are unable to establish from the stipulated facts that petitioners were 'person[s] who [were] actively engaged in trading [I.R.C. §] 1256 contracts and [were] registered with a domestic board of trade which is designated as a contract market by the Commodities Futures Trading Commission' during the years at issue." 56 T.C.M. at 866. *See* n. 2 *ante*. Since the appellants' commodities dealer status remained in dispute, and since their entitlement to the presumption provided by section 108 revolved around this controverted issue of material fact, the Tax Court denied their summary judgment motion, a disposition not before us on appeal. 56 T.C.M. at 867.

The Commissioner cross-moved for summary judgment on the basis that, as a matter of law, even if the appellants were commodities dealers they were not entitled to the deductions. Relying on its opinion in

*Glass* for the proposition that the London option-straddle transactions were devoid of economic substance, and on its opinion in *Cook v. Comm'r*, 90 T.C. 975 (1988), *aff'd*, 931 F.2d 59 (9th Cir.1991) (table), holding that since the London option-straddle transactions are economic shams devoid of substance even commodities dealers may not take deductions based on losses sustained in the transactions, the Tax Court granted the Commissioner's motion. The court held that, as a matter of law, even if appellants are commodities dealers, the London option-straddle transactions are shams, 56 T.C.M. at 869, and that since the transactions therefore lack economic substance, they produce no "loss" to which section 108 could apply. *Id.*

The Tax Court based its summary judgment on a legal determination regarding the construction of section 108 and thus our review is plenary. *See Pleasant Summit Land Corp. v. Comm'r*, 863 F.2d 263, 268 (3d Cir.1988), *cert. denied*, —— U.S. ——, 110 S.Ct. 260, 107 L.Ed.2d 210 (1989); *Casper v. Comm'r*, 805 F.2d 902, 904 (10th Cir.1986) (Tax Court's decision to grant summary judgment is legal determination reviewable *de novo* by court of appeals). As the Commissioner was the prevailing party in the Tax Court, we resolve all controverted issues of material fact in favor of the appellants and accordingly, like the Tax Court, for the purposes of this appeal we assume that they are commodities dealers.

## II.

### The London Option–Straddle Transactions [4]

The London Metal Exchange is a commodity exchange on which cash, futures, and option contracts in silver, copper, zinc, tin, and lead are traded. Unlike its counterparts in the United States, such as the Chicago Board Options Exchange, the Exchange does not operate as a clearing house for trades. Rather, all transactions on or subject to Exchange rules are executed on a principal-to-principal basis, meaning that a person purchasing an op-

---

**4.** The following description is culled primarily from *Glass,* and is included in an attempt to make the transactions at issue understandable. *See Glass v. Comm'r,* 87 T.C. at 1095–1106.

tion or futures contract through a broker/dealer, purchases that contract from the broker/dealer. The broker/dealer does not operate simply as an agent for a third party.

A person can trade on the Exchange in options or futures or both. The three most common forms of options are call, put, and double options. A call option gives the holder/buyer the *right* to buy from the grantor/seller a specified quantity of a commodity at an agreed price at any time before the option's expiration date. A put option gives the holder the *right* to sell a specified quantity of a commodity at an agreed price to the grantor at any time before the option's expiration date. A double option gives the holder the *right* either to sell or buy the underlying commodity at the agreed price before the option's expiration date. Under an option contract the holder has the *right* but not the obligation to purchase or sell the stated commodity at the agreed price and, accordingly, is never at risk for more than the cost of the option.

A futures contract *requires* the buyer to receive, and the seller to deliver, a specified quantity of a given commodity at some future date. Although a futures contract is legally binding between the parties, actual delivery of the underlying commodity rarely occurs. In traded futures and traded options, the contract is normally terminated ("closed out") before actual delivery by offsets, that is, the execution of an equal and opposite transaction. *See De-Martino v. Comm'r*, 862 F.2d 400, 402 (2d Cir.1988).

A "straddle" is the simultaneous holding of a contract to buy and a contract to sell the same commodity. *Kirchman v. Comm'r*, 862 F.2d 1486, 1488 (11th Cir. 1989). It consists of the simultaneous holding of a "long position" (a purchased contract) of a commodity for delivery in a future month, and a "short position" (a sold contract) for the identical amount of the same commodity for delivery in a different future month. Each contract is called the "leg" of the straddle. A straddle may be established (or "put on") using either option or future contracts or a com-

bination of both. A "switch" occurs when the holder of a straddle liquidates (*i.e.*, closes out) one leg of the straddle and replaces it by either purchasing or selling (depending on which leg was closed out) an identical quantity of the same commodity for delivery in a different month.

The potential for profit from a straddle derives from changes in the price differential between the legs of the straddle. A straddle in which the long position is held in a month farther out than the short position increases in value if the price differential between the legs widens, and decreases in value if the price differential narrows. Conversely, a straddle in which the short position is held in a month farther out than the long position increases in value if the price differential narrows, and decreases in value if the price differential widens.

On the Exchange, the more common transaction strategy involved what is called the option-straddle transaction. The option-straddle strategy was based on the use of both option and futures contracts.

The typical London option transaction involved a two-year series of trades in options and futures designed to create losses in the first year and nearly offsetting gains in the second year. In the first year, the following combination of trades was initiated:

(1) an option-straddle was established, consisting of the simultaneous purchase and sale of either a call or put option, or both, for identical quantities of the same commodity with different delivery dates; and

(2) a futures straddle was also established, consisting of the simultaneous purchase and sale of futures contracts for identical quantities of the same commodity with different delivery dates.

Shortly after the option-straddle was established, the legs would be closed out through the purchase and sale of identical offsetting positions. If a call option was purchased, the dealer would sell an identical put option; vice versa for a put option. Because this second set of option contracts would be purchased and sold on a different date than the original option contracts, the

prices of the contracts would differ. The result would be that in closing out one leg of the option straddle, the taxpayer would incur a loss, and in closing out the other leg, the taxpayer would incur an approximately equal gain. The loss realized would be deducted as ordinary loss under I.R.C. § 165(c)(2) and offset income from other unrelated sources. The gain would be a short-term capital gain. *See Kirchman,* 862 F.2d at 1488.

Next, to defer recognition of the gain, the "loss" leg of the futures straddle would be closed out in a "switch transaction" through the purchase (or sale) of an identical offsetting position and replaced by a new position with a different delivery date. The net loss on the closed leg of the futures straddle would be reported as a short-term capital loss in the first year and would approximately equal the short-term capital gain incurred in closing out the option position described above. This capital loss would offset the capital gain.

The final step of a typical option-straddle transaction occurred in the subsequent year, although not earlier than six months after the switch. Both legs of the futures straddle would be closed out by offsetting trades, resulting in a gain approximately equal to the loss incurred on the switch in the previous year. The gain incurred would be reported as either short-term or long-term capital gain in the second year of the transaction. Many participants attempted to defer or convert this second-year gain by engaging in a rollover transaction, which meant putting on another futures straddle in the second year of the transaction, subsequently closing out the loss leg in a switch and then closing out the straddle at a gain in the third year. The net general objective of these transactions was the realization of ordinary loss in the first year, and the deferral of capital gain, short- or long-term, to the second year. While paper "losses" were substantial for tax purposes in year-one, ultimate actual losses, if any—and actual gains, if any—, were small by comparison.

## III.

### *The Glass Decision and Section 108*

*Glass v. Comm'r,* 87 T.C. 1087,[5] involved aggregate deficiencies determined by the Commissioner against over 1000 taxpayers totalling in excess of $61 million for the years 1975–1980. The transactions involved the "London option-straddle transaction," and were all virtually identical to the transactions described above. There were two issues before the Tax Court in *Glass:* (1) whether the transactions were shams; and (2) if not, whether the transactions were entered into for profit under the standard set forth in section 108. 87 T.C. at 1091.

The Tax Court in *Glass* found that the London option transaction was without economic substance and was a sham.[6] *Id.* at

---

**5.** *Glass* has been affirmed by every circuit court of appeals to which it has been appealed. *Lee v. Comm'r,* 897 F.2d 915 (8th Cir.1989); *Kielmar v. Comm'r,* 884 F.2d 959 (7th Cir.1989); *Dewees v. Comm'r,* 870 F.2d 21 (1st Cir.1989); *Friedman v. Comm'r,* 869 F.2d 785 (4th Cir.1989); *Keane v. Comm'r,* 865 F.2d 1088 (9th Cir.1989); *Ratliff v. Comm'r,* 865 F.2d 97 (6th Cir.1989); *Killingsworth v. Comm'r,* 864 F.2d 1214 (5th Cir.1989); *Kirchman v. Comm'r,* 862 F.2d 1486 (11th Cir. 1989); *Yosha v. Comm'r,* 861 F.2d 494 (7th Cir.1988); *Herrington v. Comm'r,* 854 F.2d 755 (5th Cir.1988), *cert. denied,* 490 U.S. 1065, 109 S.Ct. 2062, 104 L.Ed.2d 628 (1989).

**6.** An economic sham is distinguished from a factual sham. A factual sham is one in which the alleged transactions never actually took place. In an economic sham, or a sham in substance, the alleged transactions actually took place, but are nonetheless without economic substance. The Tax Court has defined "sham in substance" as the "expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits." *Falsetti v. Comm'r,* 85 T.C. 332, 347 (1985). The Court of Appeals for the Ninth Circuit has defined a transaction as a sham in substance if it is fictitious or if it has no business purpose or economic effect other than the creation of tax losses. *Sochin v. Comm'r,* 843 F.2d 351, 354 (9th Cir.), *cert. denied,* 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988). *See also Friedman v. Comm'r,* 869 F.2d 785, 792 (4th Cir.1989) (same). The Court of Appeals for the Eleventh Circuit has stated that a transaction with the sole function of the production of tax deductions is a sham regardless of the taxpayer's motives. *Kirchman v. Comm'r,* 862 F.2d 1486, 1491 (11th Cir.1989).

1177. It therefore determined that the transaction and loss deductions taken pursuant thereto must be disregarded for federal income tax purposes. *Id.* The Tax Court analyzed the entire two-year scheme in detail and concluded that the transactions were "intentional[ly] skew[ed] ... to realize year one losses...." *Id.* at 1174. The potential for a profit existed but the taxpayers avoided making a profit by intentionally realizing losses in the first year which "were not necessary or helpful in profiting from difference gains in petitioners' commodity straddle transactions." *Id.* at 1175–76. Based on its determination that the London options transactions lacked economic substance and were shams, the Tax Court further held that section 108 was "not available to permit loss deductions in the first year of commodity straddle transactions when, as here, the sham involves a series of transactions having no business or profit-making function apart from obtaining tax deductions." *Id.* at 1176.

The Tax Court in *Glass* rejected the taxpayers' argument that, since the tax effects to them of the transactions were sometimes adverse, the Commissioner's allegation that they paid for pre-arranged tax results was unfounded since it failed to account for the ability to offset in future years. The Tax Court found that "[i]t requires no lengthy or elaborate analysis of the facts to demonstrate that petitioners did not enter into these transactions primarily for economic profit," and that "[t]he expected tax benefits completely overwhelm[ed] any potential economic benefits that might have been expected from the straddles." *Id.* at 1162. "[P]etitioners hoped to obtain substantial interest-free loans from the government and achieve more favorable tax rates. At the same time the actual economic gains realized through straddling were either minuscule or non-existent." *Id.* at 1163.

During the course of the proceedings in *Glass*, but before decision was rendered, Congress enacted section 108 of the Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, 630, subsection *(a)* of which essentially provided that losses from the disposition of a leg of a straddle entered into before 1982, were deductible if the straddle was entered into "for profit." Subsection *(b)* provided that straddle transactions of commodities dealers were rebuttably presumed to have been entered into for profit.[7] Section 108 was enacted as a response to the Commissioner's decision to challenge the deductibility of losses in-

---

As characterized by at least one court, the economic substance requirement is a sub-test for a sham transaction. That is, there is a two-part test of whether a transaction constitutes a sham. Under this test, a transaction is a sham if: (1) it is not motivated by any economic purpose outside of tax considerations; and (2) it is without economic substance because no real potential for profit exists. *Rice's Toyota World, Inc. v. Comm'r,* 752 F.2d 89, 91 (4th Cir.1985) (interpreting sham transaction doctrine of *Frank Lyon Co. v. United States,* 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978)).

In the case before this court, the London option transactions were found by the Tax Court to be shams and without economic substance—indeed, the parties essentially stipulated to this finding. Although this characterization may be repetitive, the Tax Court's determination that the transactions involved were shams has been uniformly upheld on appeal. *See, e.g., Lee,* 897 F.2d at 915; *Dewees,* 870 F.2d at 21; *Friedman,* 869 F.2d at 785; *Keane,* 865 F.2d at 1088; *Ratliff,* 865 F.2d at 97; *Kirchman,* 862 F.2d at 1486.

**7.** Section 108 originally provided in part:

TREATMENT OF CERTAIN LOSSES ON STRADDLES ENTERED INTO BEFORE EFFECTIVE DATE OF ECONOMIC RECOVERY TAX ACT OF 1981.

(a) GENERAL RULE—For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions—

(1) which were entered into before 1982 and form part of a straddle, and

(2) to which the amendments made by title V of the Economic Recovery Tax Act of 1981 do not apply,

any loss from such disposition shall be allowed for the taxable year of the disposition *if such position is part of a transaction entered into for profit.*

(b) PRESUMPTION THAT TRANSACTION ENTERED INTO FOR PROFIT.—For purposes of subsection (a), any position held by a commodities dealer or any person regularly engaged in investing in regulated futures contracts shall be rebuttably presumed to be part of a transaction entered into for profit.

Tax Reform Act of 1984, Pub.L. No. 98–369, § 108(b), 98 Stat. 630 (emphasis added).

curred in London option transactions, which resulted in an overwhelming amount of litigation. To deal with the backlog of straddle cases, in 1984 Congress passed section 108, with its for-profit presumption.[8]

The Tax Court first applied the 1984 section 108 in *Miller v. Comm'r*, 84 T.C. 827 (1985). In *Miller*, the Commissioner argued that the phrase "transaction entered into for profit" used in section 108 was unambiguous, was intended to be interpreted identically to the exact same phrase as used in I.R.C. § 165(c), and transactions not entered into *primarily* for profit were therefore not entitled to a loss deduction. A divided Tax Court rejected this argument finding that the language of section 108 was "sufficiently ambiguous to warrant [a] search for interpretive assistance." 84 T.C. at 838. Relying on the legislative history of section 108, the Tax Court found that the phrase "transaction entered into for profit" as used in section 108, allowed deductions for loss when the taxpayer merely had a "reasonable expectation of any profit." Section 108 did not require that profit have been the primary motive for the transaction. *Id.* at 841–42.

The Tax Court's decision in *Miller*, however, was reversed. *Miller v. Comm'r*, 836 F.2d 1274 (10th Cir.1988). The Court of Appeals for the Tenth Circuit held that section 108 incorporated the "primarily for profit" standard that has emerged as the settled case law of I.R.C. § 165(c)(2). Prior to the court of appeals' decision, however, and in direct response to the Tax Court's holding in *Miller*, Congress retroactively amended section 108 in section 1808(d) of the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085, 2817. As amended, section 108(a) provides that losses attributable to the disposition of a leg of a commodity straddle are deductible if incurred in a trade or business *or* in a transaction entered into for profit. Section 108(b), in turn, provides an irrebuttable presumption that losses incurred by a commodities dealer were incurred in a trade or business.[9] As explained by the Tax Court in *Glass*, amended section 108 traces the pattern of the loss provisions of I.R.C. §§ 165(c)(1) and (2),[10] and "makes it clear that losses incurred by commodities dealers trading in commodities are deductible under section 108 since they are losses incurred in a trade or business." Non-dealer investors, on the other hand, must meet the test of loss incurred in a transaction entered into for profit. Thus, in *Glass*, rendering decision based on section 108 as retroactively amended, the Tax Court stated that the deductibility of straddle losses was to be determined by a "primarily for profit"

---

**8.** This history of Section 108 is derived primarily from *Friedman v. Comm'r*, 869 F.2d at 789–91.

**9.** As amended, Section 108 reads in part:

TREATMENT OF CERTAIN LOSSES ON STRADDLES ENTERED INTO BEFORE EFFECTIVE DATE OF ECONOMIC RECOVERY TAX ACT OF 1981.
(a) GENERAL RULE.—For purposes of the International Revenue Code of 1954, in the case of any disposition of 1 or more positions—
(1) which were entered into before 1982 and form part of a straddle, and
(2) to which the amendments made by title V of the Economic Recovery Tax Act of 1981 do not apply,
any loss from such disposition shall be allowed for the taxable year of the disposition *if such loss is incurred in a trade or business,* or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business.

(b) *LOSS INCURRED IN A TRADE OR BUSINESS.*—For purposes of subsection (a), *any loss incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business.*
Tax Reform Act of 1986, Pub.L. No. 99–514, § 1808(d)(1)–(2), 100 Stat. 2817–18 (emphasis added).

**10.** Those sections relate to I.R.C. § 165(a), which provides:

(a) General rule.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated by insurance or otherwise.
Sections 165(c)(1) and (2), I.R.C., in turn provide:
(c) Limitation on losses of individuals.—In the case of an individual, the deduction under subsection (a) shall be limited to—
(1) losses incurred in a trade or business;
(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business....

standard. 87 T.C. at 1167.[11] "The case before us," said the court, "does not involve commodities dealers." *Glass*, 87 T.C. at 1167.

## IV.

### *The Cook Decision*

Subsequent to its decision in *Glass*, the Tax Court decided *Cook v. Comm'r*, 90 T.C. 975 (1988), *aff'd*, 931 F.2d 59 (9th Cir.1991) (table). *Cook* involved a motion for reconsideration by one of the taxpayers in *Glass* based on a taxpayer's contention that he was in fact a commodities dealer during the tax years at issue in *Glass*. Therefore, according to the taxpayer, the *per se* rule under section 108(b) for commodities dealer losses incurred in a trade or business allowed him to take deductions for losses incurred in the London option transactions, 90 T.C. at 979. For purposes of his argument, the taxpayer conceded that his straddle transactions "lacked economic substance and were a sham in the economic sense," which the Tax Court noted was "consistent with [its] holding in *Glass*." *Id.* at 980.

The *Cook* petitioner's position was, of course, virtually identical to that of the appellants in that both rest on section 108(b). Thus, in this case, the appellants contend as did the petitioner in *Cook*, that a commodities dealer, as a matter of law, is entitled to the deductions for losses on the Exchange because under section 108(b), losses incurred by a commodities dealer in straddle transactions are irrebuttably presumed to have been incurred in a trade or business and under section 108(a) are allowable deductions. *See* 90 T.C. at 979.

The Commissioner's position in *Cook* was identical to the position he takes before this court. The Commissioner argued there that section 108(b) is not applicable to sustain loss deductions claimed from the Lon-

don option transactions because the transactions were shams in substance, prearranged solely to achieve a tax-avoidance objective. As such, section 108(a) does not apply in determining whether the losses were allowable. Because section 108(a) does not apply, section 108(b) and its presumption do not come into play. Put another way, the Commissioner argued—and again argues here—that when a transaction lacks economic substance, there is, in the legal sense, no *loss* for purposes of section 108(a), and the presumption of section 108(b), therefore, simply does not apply.

In *Cook*, the Tax Court conceded that its statement in *Glass* that the case did not involve commodities dealers was "inaccurate" at least as to Cook. The Tax Court nonetheless did not allow his deductions. It held that, even as to commodities dealers, "it is appropriate before applying the *per se* rule of section 108(b) to enquire whether straddle transactions were fictitious, prearranged, or otherwise in violation of the rules of the exchange, and if so, whether there were losses actually incurred." 90 T.C. at 986. *See also id.* n. 6. Since the London option transactions were unquestionably prearranged to generate a loss, reasoned the court, the *per se* rule of section 108(b) was unavailable to Cook.

In reaching its determination in *Cook*, the Tax Court considered it appropriate to consider the legislative history surrounding section 108(b) which "expressly provides a caveat to the per se rule." 90 T.C. at 984. The House Report regarding amended section 108(b) states that the section 108(b) "presumption would not be available in any cases where the trades were fictitious, *prearranged*, or otherwise in violation of the rules of the exchange in which the dealer is a member." H.R. Rep. 426, 99th Cong., 1st Sess. 911 (1985) (emphasis added).

---

11. *See also Dewees v. Comm'r*, 870 F.2d at 29 (Congress enacted section 108 to clarify the application of the general loss deduction rule of section 165 to straddle transactions because Congress wanted to make clear that taxpayers could take a straddle position loss in the year of disposition; prior to the enactment of section 108, the IRS had claimed that the sale of one leg

of a straddle was not a closed and completed transaction under which the taxpayer could deduct losses—rather, the taxpayer had to dispose of the other leg to deduct losses under section 165(c)); *DeMartino*, 862 F.2d at 407 (section 108 was intended to overrule the sharply divided Tax Court's decision in *Miller* and to harmonize section 108 with section 165 of the Code).

The Tax Court stated that the "prearranged" language of the Report "casts a shadow on the otherwise bright line parameters of the per se rule." 90 T.C. at 985. Based on the language in the House Report, the Tax Court determined that, where the losses are prearranged, the issue arises whether the losses were actually incurred, which is a necessary precondition to the application of the *per se* rule. The Tax Court reiterated its finding in *Glass* that the losses putatively incurred were lacking in economic substance and therefore were shams. "In effect, then, no losses were incurred." Thus, the *per se* dealer rule is not available since section 108(b) only applies to "any loss" incurred by a commodities dealer. *Id.* at 985. The Tax Court further noted that "we think it would be highly anomalous to disallow loss deductions to over 1,000 petitioners claiming them under the London Option Transaction, as we have done in *Glass*, while allowing them to petitioner, even though a dealer, on the self-same transaction." *Id.* at 985. Accordingly, the holding in *Cook* stands for the proposition that the *per se* dealer rule will be unavailable not only in situations involving fictitious transactions but will also be unavailable to dealers involved in actual transactions, "prearranged" to lack economic substance.

## V.

### *Glass, Cook, and Section 108 As Applied To This Case*

Appellants' basic position before this court is that section 108(b) was intended to treat dealers as a favored class and to make the "profit motive" test inapplicable to them. They argue that section 108(b) allows them to deduct losses incurred pursuant to straddle transactions, *even if those transactions are unquestionably economic shams.* Accordingly, if dealers incur losses in transactions designed solely to generate tax losses, they are nonetheless deductible because section 108(b) precludes

the Commissioner from challenging dealers' profit motive.

The legislative history to section 108 as amended allegedly reflects a congressional intent in accord with this position. Appellants claim that section 108 was originally enacted in a congressional effort to "break the log jam" of cases in which the Commissioner challenged loss deductions based on options or future straddle transactions.[12] The amendments to section 108, particularly the addition of the irrebuttable presumption regarding commodities dealers in subsection (b), are said to reflect a congressional intent to give commodities dealers special treatment regarding straddle transactions. According to appellants, the amendment to section 108 was intended, and is understood, to have given straddle-loss-deduction amnesty to everyone engaged in the commodities trading business. Thus, appellants urge this court to hold that section 108(b) applies to provide an irrebuttable presumption that losses stemming from straddle transactions engaged in by dealers before 1982 are deductible even though such transactions were designed solely to create tax losses. We decline to accept this invitation.

*Per Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), it is settled federal tax law that for transactions to be recognized for tax purposes they must have economic substance. Therefore, economic substance is a *prerequisite* to the application of any Code provisions allowing deductions, including section 108.

The London option transactions involved lacked economic substance because they were prearranged transactions intended solely to generate tax benefits in the form of deductible losses. Thus, as they lacked economic substance, they cannot be recognized for tax purposes. Because they are not recognized for tax purposes, section 108 does not even come into play. Section 108(b) applies to "any loss" deducted under section 108(a), but section 108(a) cannot be

---

**12.** By one estimate, at least 4,400 straddle cases were pending before the Tax Court in the early 1980's. *Miller,* 84 T.C. at 855. There were over 1,400 original petitioners in *Glass* alone. *Glass,* 87 T.C. 1087–90.

applied to transactions lacking in economic substance because, in tax terms, a transaction lacking in economic substance cannot result in a "loss." The option-straddles in this case, then, lacking economic substance and therefore non-recognizable for tax purposes, produced no "losses" to which section 108(a) can apply, thus precluding any application of section 108(b).

We agree that the irrebuttable presumption in amended section 108(b) was intended to, and did, eliminate any profit motive inquiry for straddle transactions as to dealers. We agree also that this amendment reflected Congress' concern with the inherent difficulty in determining a dealer's profit motive with respect to any particular trade because a dealer is involved in so many trades. Amended section 108(b), therefore, was enacted to avoid this difficulty. Thus, section 108(b) prevents the Commissioner from disallowing loss deductions by pointing to evidence that any one dealer did not have a profit motive when engaging in a straddle transaction.

We see no basis to hold, however, that the amendment to section 108(b) was intended to override the long-standing requirement that transactions have economic substance to be qualified for loss deduction status. *See DeMartino*, 862 F.2d at 407; *Cook*, 90 T.C. at 984–85. As explained in *DeMartino*, elimination of a profit motive inquiry does not "prevent the inquiry into the economic substance of a dealer's commodity trading." The Tax Court and numerous appellate courts have held that section 108 does *not* apply to sham commodity transactions devoid of economic substance. *See, e.g., Glass*, 87 T.C. at 1176; *Keane*, 865 F.2d at 1093; *Sochin*, 843 F.2d at 353–54 n. 6. The fact that such a transaction involves a commodities dealer is neither a logical nor a statutorily-authorized reason to alter the economic substance rule.

For instance, in *DeMartino v. Comm'r*, 862 F.2d at 400, the taxpayer, a commodities trader, invested in crude oil future straddles executed on the New York Cot-

ton Exchange, a regulated American exchange. The market in crude oil futures was extremely thin and the brokers were able effectively to control the contract prices. They executed these contracts in a prearranged plan designed to create tax losses without any real possibility of gain or loss. The Commissioner assessed deficiencies which the Tax Court upheld, finding that the transactions were shams and that the losses sustained therein could not be recognized for federal tax purposes. 862 F.2d at 404. On appeal, the taxpayer claimed that he was entitled to the deductions under section 108(b) since he was a dealer. The taxpayer claimed that since his trades were not factual shams, but were cleared through a regulated American exchange, they had economic substance and, even if they did not have economic substance, section 108(b) applied to allow the deductions.

The court of appeals rejected this argument. The court first held that, even though the trades were cleared on a regulated American exchange, they lacked economic substance because they were prearranged to result in nothing more than tax losses. 862 F.2d at 406. The court then rejected the argument that section 108(b) nonetheless entitled the taxpayer/dealer to the deductions. The court stated that in enacting section 108(b):

> Congress eliminated the profit motive inquiry in cases involving dealers because of the inherent difficulty involved in making such an inquiry, *but it did not prevent inquiry into the economic substance of a dealer's commodity trading.*

862 F.2d at 407 (emphasis added).

The court further stated that section 108(a) does not apply to straddle transactions that are shams and since section 108(a) cannot apply to sham transactions, section 108(b) does not apply. The court defined a sham as a transaction that "is fictitious or ... has no business purpose or economic effect other than the creation of tax deductions." *Id.* at 406.[13]

---

**13.** Appellants claim that *DeMartino* is distinguishable from this case because it involved

transactions that were factual, rather than economic, shams. In essence, they argue that sec-

And quite recently, in *Cook v. Comm'r*, 90 T.C. 975, the Tax Court held specifically that even as to commodities dealers involved in the London option transactions, the presumption provided by section 108(b) is not available where the transactions are devoid of economic substance. As discussed above, the Tax Court held that, even as to commodities dealers, before applying section 108(b), a straddle transaction must have economic substance. *Id.* at 986. The Tax Court found that since the London option transaction was "deliberately prearranged," section 108(b) was unavailable to sustain the petitioner's deductions. *Id.*

The Tax Court considered the legislative history surrounding section 108(b) and particularly focused on the language in the House Report noted above which states that the section 108(b) "presumption would not be available in any cases where the trades were fictitious, prearranged, or otherwise in violation of the rules of the exchange in which the dealer is a member." H.R.Rep. No. 426, 99th Cong., 1st Sess. 911 (1985). The presumption in section 108(b), then, absolves dealers of the need to prove any profit motive so long as the transactions involved are not fictitious, *prearranged*, or otherwise in violation of the exchange's rules. 90 T.C. at 985–86.

Based on this language, the *Cook* court determined that, where the losses are prearranged they are non-recognizable for tax purposes. Such non-recognizable losses lack economic substance and are therefore shams. In essence, losses pursuant to sham transactions are not losses for tax purposes. Therefore, the *per se* dealer rule is not available to sustain deductions based on the alleged losses since section 108(b) only applies to "any *loss*" incurred by a commodities dealer—and any *"loss"* must be an *actual* loss.

We accept the reasoning in *DeMartino* and *Cook*, there being no principled distinction between them and the present case as to facts or legal consequences. The basic

rule of law is that taxation is based upon substance, not form. *Gregory*, 293 U.S. at 469–70, 55 S.Ct. at 267–68. The holdings in *DeMartino* and *Cook*, and the position taken by the Commissioner in this case are in accord with that rule. The result urged on this court by appellants would allow a small group of taxpayers—commodities dealers who engaged in sham straddle transactions before 1982—to claim "losses" when none in fact were sustained. We do not believe Congress intended this unseemly result, which would undermine the power and duty of the Commissioner and the courts to look beyond the mere forms of transactions to their economic substance and to apply the tax laws accordingly. *Forseth v. Comm'r*, 845 F.2d 746, 749 (7th Cir.1988).

The economic substance doctrine has been consistently applied by the courts for many years in a variety of tax situations. There is no sound reason to conclude that, in enacting the amendments to section 108(b), Congress meant to abandon the doctrine. *See, e.g., Frank Lyon Co. v. United States*, 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978) (court looked at economic substance or reality of sale and leaseback transactions); *Knetsch v. United States*, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960) (interest expense deductions disallowed because only thing of substance to be realized from transaction was tax deduction); *Commissioner v. Court Holding Co.*, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945) (recognizing step transaction doctrine, whereby courts must consider all steps of transaction in light of entire transaction, so that substance of transaction will control over form of each step).

In essence, the appellants would have this court find that, because of a backlog in the court system, Congress abandoned the economic substance requirement as to straddle transactions involving dealers, along with some 40 years of jurisprudence

---

tion 108(b) would be unavailable to sustain deductions on transactions that never actually occurred, but as long as the trades do in fact occur, even if prearranged to create tax losses, section 108(b) allows dealers to take deductions

based on them. This attempt to distinguish *DeMartino* is faulty, for in *DeMartino,* the trades *did* actually occur but were devoid of economic substance because they were designed solely to create losses. 862 F.2d at 406.

regarding the economic substance doctrine, and instead gave these sham transactions post-facto blessing. This is an unreasonable conclusion, and one which as a basic tenet of statutory interpretation should not be reached. *See Dewees*, 870 F.2d at 35–36 (it is unreasonable to believe that Congress in enacting section 108 wished to weaken the sham in substance doctrine). *See also Haggar Co. v. Helvering*, 308 U.S. 389, 394, 60 S.Ct. 337, 339–40, 84 L.Ed. 340 (1940). If Congress had intended to grant such a windfall it could and, one must assume, would have done so in a manner free from any doubt or ambiguity.

Faced with overwhelming and well-reasoned case law, *see, e.g.,* n. 15 *infra,* and less than unambiguous statutory authority, the appellants nonetheless contend that section 108(b) does apply to sustain their sham transaction deductions. They urge that the legislative history of section 108 proves that Congress, in creating the irrebuttable presumption of profit-motives for dealers, intended to allow dealers to deduct losses pursuant to sham transactions such as those involved in this case. According to the appellants, Congress clearly intended to sacrifice the tax revenue which would be received pursuant to disallowing deductions sought by dealers in its desire to clear the Tax Court's docket of cases involving straddle transactions. In its attempt to do so, it amended section 108(b) to remove the profit motive requirement as to dealers because of the inherent difficulty in determining the existence or lack thereof of profit motive for dealers in numerous individual transactions. That is, for expediency's sake, Congress gave dealers unique treatment as far as pre–1982 straddle transactions, granting them an unquestionable right to deduct losses based on straddle transactions, in an effort to clear the docket of these cases.

Although the legislative history of section 108 does reveal congressional concern with the logjam of straddle cases before the Tax Court, the idea that Congress in-tended to grant dealers the right to deduct losses pursuant to sham transactions is unpersuasive. Both the 1984 and 1986 versions of section 108(b) reflect congressional recognition that dealers conduct numerous trades, as a result of which there is an "inherent difficulty in distinguishing tax-motivated straddle transactions from profit-motivated straddle transactions...." H.R.Rep. No. 426, 99th Cong., 1st Sess. at 910–11 (1985). Thus, it is quite possible that in amending section 108(b), Congress was willing to give up a certain amount of revenue from straddle transactions because it recognized the inherent difficulty in proving a dealer's subjective profit motive as to any one transaction. This, however, is a far cry from saying that Congress intended to allow dealers to take deductions based on straddle transactions totally devoid of any purpose beyond the generation of tax deductions and passed a statute by which there would be absolutely no inquiry into the substantial tax validity of such transactions.

The much more logical conclusion is that reached by the court of appeals in *DeMartino—viz,* that section 108 eliminated the profit motive inquiry in cases involving dealers because of the inherent difficulty in making such an inquiry, but it did not prevent inquiry into the economic substance of a dealer's commodities trading. 862 F.2d at 407. There is ample support for this proposition. *See Knetsch v. United States*, 364 U.S. at 365, 81 S.Ct. at 134–35 (Court put aside district court's finding concerning motive in determining whether a transaction was a sham); *Forseth*, 845 F.2d at 748 (if a transaction is a sham, then such "niceties" as whether it was primarily for profit are not involved); *Kirchman*, 862 F.2d at 1492 (once a court determines that a transaction is a sham, no further inquiry into intent is necessary); *Dewees*, 870 F.2d at 35 (a taxpayer cannot deduct a sham transaction loss, irrespective of his subjective profit motive).[14] Further-

---

14. In their reply brief to this court, appellants claim that the Supreme Court recently held in *Cottage Savings Ass'n v. Comm'r,* —— U.S. ——, 111 S.Ct. 1503, 113 L.Ed.2d 589 (1991), that

"transactions will not be denied effect as wanting in economic substance if the transactions are bona fide." They argue that since the transactions here actually occurred, they were bona

more, we see no internal inconsistency in the *DeMartino* conclusion as it does not follow that Congress by restraining one inquiry intended that a conclusion on another point must follow.

Finally, although the majority of the cases construing the London option transactions did not involve commodities dealers, a number of them do involve section 108 in general. These cases have uniformly held that when a transaction is a sham, it is outside the purview of section 108. Since the application of section 108*(b)* depends on the availability of section 108*(a)*, the fact that this case involves commodities dealers is not sufficient to distinguish it from the overwhelming majority of cases which have found section 108 unavailable to the London option transactions.[15] These cases confirm our belief that Congress did not enact section 108(b) as a safe harbor for commodities dealers who engage in transactions devoid of economic substance, prearranged to create losses. In essence, the problem with the appellants' case is that they were really trading tax consequences rather than silver.

## VI.

### Conclusion

The Tax Court correctly determined that the option-straddle transactions at issue in this case are shams, devoid of economic substance, and thus any losses generated thereby cannot be the basis for deductions. Section 108(a), which allows *loss* deductions for straddle transactions, does not apply to countenance deductions for a sham transaction from which no true "loss" occurs, and the trade-or-business-loss presumption of section 108(b) cannot be claimed by commodities dealers unless they have sustained an actual loss. Therefore, we will affirm the decisions of the Tax Court and will dismiss the appeals of the Commissioner.

fide and cannot be found wanting in economic substance. This argument mischaracterizes the holding in *Cottage* and has no merit in this case. In *Cottage*, the Court rejected the Commissioner's argument that the transactions at issue lacked economic substance and therefore could not sustain the deductions taken. There the transactions involved the exchange by a financial institution of its interests in one group of residential mortgages for another lender's interests in a different group of residential mortgages. The mortgages given over had a face value of some $2 million more than the fair market value of those received, based on which the petitioner took a loss deduction. As relevant to this case, the Court rejected the Commissioner's contention that the losses could not be sustained because they lacked economic substance because the Commissioner failed to meet its burden of proof on this claim. That is, the Commissioner relied on a case in which a finding of lack of economic substance was based on the determination that the transaction was not conducted at arm's length and because the taxpayer never relinquished control over the securities on which he based his deduction. The Commissioner in *Cottage* failed in any regard to contend or prove that the exchange involved was not at arm's length or that Cottage did not actually give up control over the mortgages it exchanged.

Therefore, the Court rejected the Commissioner's claim that the transaction lacked economic substance. *Cottage* cannot be read for the proposition that, as long as a transaction is bona fide, *i.e.*, actually occurred, it cannot be denied economic substance.

**15.** *See, e.g., Lee v. Comm'r,* 897 F.2d 915, 917 (8th Cir.1989) ("[t]he London option transactions ... lacked economic substance. As such, they are outside the purview of ... [section] 108 ..."); *Friedman v. Comm'r,* 869 F.2d at 791 (section 108 is inapplicable to transactions constituting economic shams); *Keane v. Comm'r,* 865 F.2d at 1092–93 (because the London option transactions had no economic substance, section 108 did not apply); *Kirchman v. Comm'r,* 862 F.2d at 1494 (since the transaction as a whole, not just the first year losses, were designed solely to produce tax benefits, the transaction was a sham in substance and section 108 does not apply); *Sochin v. Comm'r,* 843 F.2d at 353–54, n. 6 (section 108 does not apply until the court determines that the transaction is not a sham); *Enrici v. Comm'r,* 813 F.2d 293, 295, n. 1. (9th Cir.1987) (same); *Mahoney v. Comm'r,* 808 F.2d 1219, 1220 (6th Cir.1987) (same); *Glass,* 87 T.C. at 1176 (section 108 unavailable to permit loss deductions in year one of sham transaction).