

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-13-1998

# ACM Partnership v. Commissioner IRS (Part II)

Precedential or Non-Precedential:

Docket 97-7484,97-7527

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"ACM Partnership v. Commissioner IRS (Part II)" (1998). *1998 Decisions*. Paper 243.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/243

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Volume 2 of 2

Filed October 13, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 97-7484 and 97-7527

ACM PARTNERSHIP,
SOUTHAMPTON-HAMILTON COMPANY,
TAX MATTERS PARTNER,

        Appellant in No. 97-7484

v.

COMMISSIONER OF INTERNAL REVENUE

ACM PARTNERSHIP,
SOUTHAMPTON-HAMILTON COMPANY,
TAX MATTERS PARTNER,

v.

COMMISSIONER OF INTERNAL REVENUE

        Appellant in No. 97-7527

On Appeal from the United States Tax Court
(Tax Court No. 10472-93)

Argued June 23, 1998

BEFORE: GREENBERG, ALITO, and McKEE,
Circuit Judges

(Filed October 13, 1998)

These findings, which are amply supported by the record, demonstrate a lack of objective economic consequences arising from ACM's offsetting acquisition and virtually immediate disposition of the Citicorp notes.[33] On November 3, 1989, ACM invested $175 million of its cash in private placement Citicorp notes paying just three basis points more than the cash was earning on deposit, then sold the same notes 24 days later for consideration equal to their purchase price, in a transaction whose terms had been finalized by November 10, 1989, one week after ACM acquired the notes.[34] These transactions, which generated the disputed capital losses by triggering the application of the ratable basis recovery rule, offset one another with no net effect on ACM's financial position. Examining the sequence of ACM's transactions as a whole as we must in

assessing their economic substance, see Court Holding Co.,
324 U.S. at 334, 65 S.Ct. at 708; Weller, 270 F.2d at 297,
we find that these transactions had only nominal,
incidental effects on ACM's net economic position.

Viewed according to their objective economic effects
rather than their form, ACM's transactions involved only a
fleeting and economically inconsequential investment in
and offsetting divestment from the Citicorp notes. In the
course of this brief interim investment, ACM passed $175
million of its available cash through the Citicorp notes
before converting 80% of them, or $140 million, back into
cash while using the remaining 20%, or $35 million, to

---

33. Because we find that the lack of objective economic consequences of
ACM's transactions, which is evident from the Tax Court's well–
supported factual findings, is essential to assessing whether the
transaction's tax consequences may be disregarded and lends significant
support to the court's ultimate finding that ACM's transactions did not
have sufficient substance to be recognized for tax purposes, we proceed
to conduct this portion of the economic substance analysis although the
Tax Court did not do so explicitly. See Northern Indiana Pub. Serv. Co.,
115 F.3d at 510 (holding that court of appeals may affirm Tax Court
decisions on any grounds found in the record regardless of Tax Court's
rationale).

34. The consideration consisted of $140 million in cash and LIBOR notes
whose present value was $34,410,814, or $35,000,000, reduced by the
transaction costs established by Merrill Lynch.

acquire an amount of LIBOR notes that was identical, apart
from transaction costs, to the amount of such notes that
ACM could have acquired by investing its $35 million in
cash directly into such assets. Thus, the transactions with
respect to the Citicorp notes left ACM in the same position
it had occupied before engaging in the offsetting acquisition
and disposition of those notes.

Just as the taxpayer in Gregory engaged in offsetting
transactions by creating a new corporation, transferring
stock to the corporation, transferring the stock back out of
the corporation and then liquidating the corporation, just
as the taxpayers in Knetsch and Weller engaged in
offsetting transactions by acquiring annuity policies and
borrowing back virtually their entire value, and just as the
taxpayers in Lerman and the other property disposition
cases engaged in inconsequential transactions by disposing
of property while retaining the opportunity to reacquire the
same or virtually identical property at the same price, so

ACM engaged in mutually offsetting transactions by acquiring the Citicorp notes only to relinquish them a short time later under circumstances which assured that their principal value would remain unchanged and their interest yield would be virtually identical to the interest yield on the cash deposits which ACM used to acquire the Citicorp notes.35

Gregory requires us to determine the tax consequences of a series of transactions based on what "actually occurred." 293 U.S. at 469, 55 S.Ct. at 267. Just as the Gregory Court found that the intervening creation and dissolution of a corporation and transfer of stock thereto and therefrom was a "mere device which put on the form of a corporate reorganization as a disguise for concealing its real

_____

35. The variable rate on the Citicorp notes presented a theoretical possibility that the consequences of owning those notes would vary from the consequences of leaving ACM's funds on deposit at a rate of interest virtually identical to the initial rate on the Citicorp notes. However, ACM's exposure to any fluctuation in the rate of return on its Citicorp note investment was illusory, as the interest rates were scheduled to be reset only once per month and ACM had arranged to hold the notes for only 24 days, encompassing only one interest rate adjustment on November 15 that would affect the notes for only 12 days before their disposition. See 73 T.C.M. at 2200.

39

character" which amounts to a mere "transfer .. . of corporate shares to the [taxpayer]," so we find that ACM's intervening acquisition and disposition of the Citicorp notes was a mere device to create the appearance of a contingent installment sale despite the transaction's actual character as an investment of $35 million in cash into a roughly equivalent amount of LIBOR notes.36 Thus, the acquisition and disposition of the qualifying private placement Citicorp notes, based upon which ACM characterized its transactions as a contingent installment sale subject to the ratable basis recovery rule, had no effect on ACM's net economic position or non-tax business interests and thus, as the Tax Court properly found, did not constitute an economically substantive transaction that may be respected for tax purposes. See Gregory, 293 U.S. at 469-70, 55 S.Ct. at 267-68; Knetsch, 364 U.S. at 366; Lerman, 939 F.2d 44; Weller, 270 F.3d at 297.37

ACM contends that the Tax Court was bound to respect the tax consequences of ACM's exchange of Citicorp notes for LIBOR notes because, under Cottage Sav. Ass'n v. Commissioner, 499 U.S. 554, 111 S.Ct. 1503 (1991), an exchange of property for "materially different" assets is a

36. ACM emphasizes that the total consideration it was to receive in exchange for the Citicorp notes genuinely was contingent, in substance as well as in form, because the amount depended on afluctuating market variable "precisely [as] the statute and the regulations anticipated." Br. at 31–32. However, the receipt of genuinely contingent payments is necessary but not sufficient to trigger the application of the ratable basis recovery rule which applies only in the context of a contingent installment sale. Absent an economically substantive disposition of qualifying property, the transactions do not constitute a bona fide contingent installment sale within the meaning of the provisions which ACM seeks to invoke. See I.R.C. SS 453(b), 453(k); Temp. Treas. Reg. S 15a.453–1(c).

37. As discussed above, each of these cases involved objective acts which satisfied the technical requirements of the Internal Revenue Code provisions that the taxpayer sought to invoke, but which the courts disregarded for tax purposes because they lacked any net effect on the taxpayer's economic position or non-tax business interests. Accordingly, we are unpersuaded by ACM's argument that its transactions must be regarded as economically substantive because it actually and objectively engaged in them. See br. at 21.

substantive disposition whose tax effects must be recognized. We find Cottage Savings inapposite. The taxpayer in that case, a savings and loan association, owned fixed–rate mortgages whose value had declined as interest rates had risen during the preceding decade. The taxpayer simultaneously sold those mortgages and purchased other mortgages which were approximately equal in fair market value, but far lower in face value, than the mortgages which the taxpayer relinquished. The Court found that the exchange for different mortgages of equivalent value afforded the taxpayer "legally distinct entitlements," and thus was a substantive disposition which entitled the taxpayer to deduct its losses resulting from the decline in value of the mortgages during the time that the taxpayer held them. Id. at 566, 111 S.Ct. at 1511.

The distinctions between the exchange at issue in this case and the exchange before the Court in Cottage Savings predominate over any superficial similarities between the two transactions. The taxpayer in Cottage Savings had an economically substantive investment in assets which it had acquired a number of years earlier in the course of its ordinary business operations and which had declined in actual economic value by over $2 million from approximately $6.9 million to approximately $4.5 million from the time of acquisition to the time of disposition. See

Cottage Sav., 499 U.S. at 557–58, 111 S.Ct. at 1506. The taxpayer's relinquishment of assets so altered in actual economic value over the course of a long-term investment stands in stark contrast to ACM's relinquishment of assets that it had acquired 24 days earlier under circumstances which assured that their principal value would remain constant and that their interest payments would not vary materially from those generated by ACM's cash deposits.38

_____

38. In Lerman, 939 F.2d at 55–56 & n.14, we observed that Cottage Savings involved the relinquishment of assets whose value had declined by over $2 million. Because the transaction in Cottage Savings brought about the realization of a $2 million economic loss resulting from the disposition of depreciated assets in which the taxpayer had an economically substantive investment, we reject ACM's contention, see reply br. at 15, that the case recognized as an economically substantive loss any tax loss arising from a transaction in which the taxpayer disposes of property in an arms'-length transaction. The Cottage Savings Court had no occasion to address a transaction like that before us in which the taxpayer relinquished property after a minimal holding period with no intervening change in economic value.

While the dispositions in Cottage Savings and in this case appear similar in that the taxpayer exchanged the assets for other assets with the same net present value, beneath this similarity lies the more fundamental distinction that the disposition in Cottage Savings precipitated the realization of actual economic losses arising from a long-term, economically significant investment, while the disposition in this case was without economic effect as it merely terminated a fleeting and economically inconsequential investment, effectively returning ACM to the same economic position it had occupied before the notes' acquisition 24 days earlier.39

As the Supreme Court emphasized in Cottage Savings, deductions are allowable only where the taxpayer has sustained a " `bona fide' " loss as determined by its " `[s]ubstance and not mere form.' " 499 U.S. at 567–68, 111 S.Ct. at 1511 (quoting Treas. Reg. S 1.165-1(b)). According to ACM's own synopsis of the transactions, the contingent installment exchange would not generate actual economic losses. Rather, ACM would sell the Citicorp notes for the same price at which they were acquired, see app. at 275–77, 321, 300, generating only tax losses which offset precisely the tax gains reported earlier in the transaction with no net loss or gain from the disposition. See app. at 301.40 Tax losses such as these, which are purely an artifact of tax accounting methods and which do not

correspond to any actual economic losses, do not constitute

_____

39. ACM contends that its disposition of the Citicorp notes was substantive because it "relinquished the benefits and burdens of owning the Citicorp notes for the distinct benefits and burdens of owning $140 million of cash and the LIBOR notes." Br. at 28. This argument, however, erroneously assumes that ACM had acquired the benefits and burdens associated with the Citicorp notes in an economically substantive sense, when in reality ACM's brief investment in and offsetting divestment from these assets exposed ACM only to de minimis risk of changes in principal value or interest rates.

40. The participation of a foreign partner that was impervious to tax considerations and that claimed most of the reported gains while allocating to Colgate virtually all of the losses allowed Colgate as ACM's major U.S. partner to reap the benefits of the tax losses without sustaining the burdens of the offsetting tax gains.

42

the type of "bona fide" losses that are deductible under the Internal Revenue Code and regulations.

While ACM contends that "it would be absurd to conclude that the application of the Commissioner's own [ratable basis recovery] regulations results in gains or losses that the Commissioner can then deem to be other than `bona fide,' " reply br. at 14, its argument confounds a tax accounting regulation which merely prescribes a method for reporting otherwise existing deductible losses that are realized over several years with a substantive deductibility provision authorizing the deduction of certain losses. In order to be deductible, a loss must reflect actual economic consequences sustained in an economically substantive transaction and cannot result solely from the application of a tax accounting rule to bifurcate a loss component of a transaction from its offsetting gain component to generate an artificial loss which, as the Tax Court found, is "not economically inherent in" the transaction. 73 T.C.M. at 2215.41 Based on our review of the record regarding the objective economic consequences of ACM's short-swing, offsetting investment in and divestment from the Citicorp notes, we find ample support for the Tax Court's determination that ACM's transactions generated only "phantom losses" which cannot form the basis of a capital loss deduction under the Internal Revenue Code.42

_____

41. Because the ratable basis recovery rule simply provides a method for reporting otherwise existing economically substantive losses, we find it

irrelevant that the rule recognizes that its application could
"inappropriately defer or accelerate recovery of the taxpayer's basis,"
resulting in " `substantial distortion' " of the tax consequences realized
in
any particular year of a transaction. See ACM br. at 32-34 (quoting
Temp. Treas. Reg. SS 15a.453-1(c)(3), (c)(7)). While the rule contemplates
some distortion as to the timing of when actual gains or losses are
reported over the span of a contingent installment sale, it does not
contemplate the reporting of losses which are not the bona fide result of
an economically substantive transaction. Thus, contrary to ACM's
argument, the tax losses it reported are not "precisely what the
[regulations] intended." See br. at 33.

42. Having found ample support for the Tax Court's conclusion that
ACM's transactions lacked economic substance and thus cannot give rise

43

3. Subjective Aspects of the Economic Sham Analysis

In making its determination that it did "not find any
economic substance" in ACM's transactions, the Tax Court
relied extensively on evidence that the transactions were
not intended to serve any "useful non-tax purpose" and
were not reasonably expected to generate a pre-tax profit.
See 73 T.C.M. at 2215, 2229. ACM contends, br. at 34, that
the Tax Court improperly conducted a "generic tax-
independent" inquiry into the non-tax purposes and
potential pre-tax profitability of the transaction based on a
misapplication of Gregory, 293 U.S. at 469, 55 S.Ct. at 267.
According to ACM, the Tax Court mistook Gregory's
scrutiny of the "business or corporate purpose" behind the
transaction for a universally applicable aspect of the
economic substance analysis when in reality, ACM
contends, Gregory undertook this inquiry only because the
specific Internal Revenue Code provision there at issue
required that the transaction be effected "pursuant to a
plan of reorganization." See br. at 20-23 (citing Gregory,
293 U.S. at 469, 55 S.Ct. at 267). Thus, ACM argues, the
Tax Court erred in considering the intended purpose and
expected profitability of the transactions in this case where
the relevant provisions providing for the gain or loss on
sales or exchanges of property, I.R.C. S 1001, and for the
treatment of installment sales, I.R.C. S 453, do not require
a particular business purpose or profit motive. See id.

We disagree, and find that the Tax Court's analysis
properly rested on economic substance cases applying
provisions which, like those relevant in this case, do not by
their terms require a business purpose or profit motive. In
Goldstein v. Commissioner, 364 F.2d 734, 736 (2d Cir.
1966), the court analyzed the economic substance of a

to taxable gains or deductible losses regardless of how those gains and losses are allocated, we need not address the Commissioner's alternative argument that the tax consequences of the transaction must be disregarded because ACM's partnership structure artificially "bifurcat[ed] the tax consequences of the transaction" by allocating taxable gains to a foreign partner and offsetting tax losses to the taxpayer in a manner which the relevant statute and regulations did not intend. See br. at 32–34.

transaction under I.R.C. S 163(a), which provides, in purely objective terms without reference to a business purpose or profit motive, that "[t]here shall be allowed as a deduction all interest paid or accrued within a taxable year on indebtedness." The Goldstein court acknowledged that this broad language did not require "that the deductible interest serve a business purpose, that it be ordinary and necessary, or even that it be reasonable," but found that the language did not permit deductions arising from a transaction that had "no substance or purpose aside from the taxpayer's desire to obtain the tax benefit of an interest deduction." Id. at 741–42. Thus, the court found, the taxpayer was not entitled to deduct her substantial interest charges, although they had accrued in an arms'-length transaction, because she had incurred the underlying debt for the sole purpose of generating a tax deduction to offset other income.43

Likewise, in Wexler, 31 F.3d 117, we considered and rejected the taxpayer's argument that a transaction need not further any non-tax objectives or hold any profit potential where the governing statutory provisions do not "require that the deductions they provide for arise from transactions having a business purpose or profit motive." Id. at 122. Despite the broad statutory language allowing the deduction of "all interest paid or accrued . . . on indebtedness," I.R.C. S 163(a), we concluded that interest charges were not deductible if they arose from a transaction "entered into without expectation of economic profit and [with] no purpose beyond creating tax deductions." Id. at

43. ACM seeks to distinguish Goldstein on the grounds that it involved a transaction which lacked objective economic effect because "economically, [the taxpayer's] activities netted zero." However, contrary to ACM's contention that it "bore all of the benefits and burdens of the ownership of . . . the Citicorp Notes and then the cash and LIBOR Notes, and stood to recognize true economic gain or loss from holding those assets," reply br. at 5–6, we find that the critical parts of ACM's

transactions also "netted zero" because its acquisition and offsetting disposition of the Citicorp notes had no net effect on its economic position. Thus, we reject ACM's attempt to distinguish Goldstein which, like the Tax Court opinion in this case, analyzed the taxpayer's intended purposes as well as the transaction's economic effects.

123-24 (citations omitted). We emphasized that interest payments "are not deductible where the underlying transaction has no purpose other than tax avoidance" even if the governing statutory language "had no express business-purpose requirement." Id. at 124 (citations omitted).44 Thus, we find no merit in ACM's argument that the Tax Court erred as a matter of law by scrutinizing the asserted business purposes and profit motives behind ACM's transactions, and we turn to the question of whether the court erred in finding that the transactions were not intended to serve ACM's professed non-tax purposes and were not reasonably expected to generate a pre-tax profit.

4. Intended Purposes and Anticipated Profitability of ACM's Transactions

Before the Tax Court, ACM conceded that there were tax objectives behind its transactions but contended that "tax-independent considerations informed and justified each step of the strategy." 73 T.C.M. at 2217. ACM asserted that its transactions, in addition to presenting "a realistic prospect that ACM would have made a profit" on a pre-tax

_____

44. Because the intended purposes behind a transaction are relevant in assessing its economic substance even where the statute is drafted in broad terms that do not require a particular intent or purpose, we are unpersuaded by ACM's argument that its transactions must be respected as economically substantive because I.R.C.S 1001, which provides for the recognition of gain or loss "on the sale or exchange of property" was intended to encompass "all exchanges." See br. at 23-25 (citing H.R. Rep. No. 179, 68th Cong., 1st Sess., at 13 (1924)). ACM emphasizes, br. at 25-27, that the Supreme Court in Cottage Savings, 499 U.S. 554, 111 S.Ct. at 1503, recognized the tax effects of a disposition that was motivated solely by tax considerations and was not expected to generate a pre-tax profit. As discussed above, however, the transaction in Cottage Savings had objective economic substance because it resulted in the realization of actual economic losses arising from a $2 million decline in market value of the property exchanged. Where such objective economic effects are lacking, scrutiny of the subjective intent behind the transactions becomes an important means of determining whether the transactions constitute a scheme with "no purpose other than tax avoidance" that may not give rise to deductible losses even where the statute contains no express requirement that the

transaction serve a non-tax business purpose. Wexler, 31 F.3d at 124.

basis, also served the tax-independent purposes of providing an interim investment until ACM needed its cash to acquire Colgate debt and a hedge against interest rate risk within the partnership. The Tax Court, however, found that the record did not support ACM's assertions that the transactions were designed either to serve these non-tax objectives or to generate a pre-tax profit, see 73 T.C.M. at 2217-29, and for the following reasons, we agree.

a. Interim Investment

ACM contends that it invested in the Citicorp notes not only because they qualified for treatment under the contingent installment sale provisions and the ratable basis recovery rule, but also because they served as an appropriate interim investment until ACM could invest in the Colgate debt whose acquisition, according to ACM, was a central objective of the partnership. The Tax Court, however, rejected this contention on the grounds that ACM did not acquire the Citicorp notes as an interim investment "to accommodate the timing of the acquisition of Colgate debt; rather, it was the reverse: The acquisition of the Colgate debt was timed so as to accommodate the requirements of the section 453 investment strategy" which required ACM to acquire and dispose of private placement notes. 73 T.C.M. at 2227. This conclusion finds abundant support in the record.

In May 1989, Merrill Lynch presented Colgate with an initial proposal of partnership transactions intended to generate capital losses which Colgate could use to offset 1988 capital gains. Although Merrill Lynch had not yet incorporated the concept of using the partnership to acquire Colgate debt issues as it did in its subsequent July 28 and August 17 proposals, its May proposal nonetheless contemplated the acquisition and imminent disposition of short-term securities, with no intervening change in their economic value, in exchange for contingent installment notes. See 73 T.C.M. at 2191; app. at 678-79, 275-77. The fact that the acquisition and disposition of short-term notes were central parts of the proposed partnership transactions even before the formulation of non-tax partnership objectives belies ACM's contention that its contingent

installment exchange of Citicorp notes was designed to accommodate the timing of its debt acquisition strategy.

Moreover, as early as October 3, 1989, one month before ACM was formed, Pohlschroeder reported that he had identified the Met notes as targets for acquisition and that, "pursuant to an inquiry to Metropolitan, we feel confident that the partnership can purchase sufficient Colgate debt" to serve the partnership's objectives. App. at 314. Yet, despite this confidence that the debt was available for purchase well in advance of ACM's formation, Pohlschroeder did not recommend that the partnership invest its funds directly in the identified debt issues or finalize the terms of the anticipated debt purpose, but rather identified as the "Next Steps" after formation of the partnership "Short-term investment securities acquired. . . . Disposition of short term investment securities to fund acquisition of Colgate debt." App. at 321. In accordance with this plan, ACM did not take any measures to pursue the prompt purchase of these debt issues upon its receipt of $205 million in cash contributions on November 2, 1989, but rather, acting through Colgate, instructed Metropolitan to attend a November 17 meeting to discuss the terms of the sale. See 73 T.C.M. at 2227.[45] Thus, we agree with the Tax Court's finding that any delay preceding the opportunity to acquire Colgate debt was of ACM's own deliberate making and was intended so that ACM could engage in the tax-motivated acquisition and disposition of qualifying short-term notes in the contingent installment sale that had been contemplated since before Merrill Lynch and Colgate devised the concept of incorporating debt acquisition objectives into Merrill Lynch's initial tax reduction proposal.

Even if ACM had faced a delay before it could purchase Colgate debt and thus needed to locate a suitable interim

_____

45. Pohlschroeder's handwritten memorandum of October 19 indicating that the Met Note acquisition would proceed on November 17 and that the Long Bond and Euro Note acquisitions would proceed after acquisition of the Citicorp notes further supports the Tax Court's determination that ACM delayed the acquisition of the debt issues to accommodate its tax-driven strategy of acquiring and disposing of private placement notes in a contingent installment sale. See 73 T.C.M. at 2200.

investment, the Citicorp notes ill served the professed purpose of holding cash assets in anticipation of an impending purchase. The notes, which in order to qualify for treatment in a contingent installment sale could not be

traded on an established market, see I.R.C. S 453(k)(2)(A), were highly illiquid and thus could not be converted back into the cash needed to purchase Colgate debt without significant transaction costs in the form of the bid-ask spread which Merrill Lynch deemed necessary to market the notes to third parties. These transaction costs rendered the illiquid Citicorp notes paying 8.78% significantly less advantageous as an interim investment than the fully liquid cash deposit account paying 8.75%. Accordingly, wefind no error in the Tax Court's conclusion that ACM's brief investment in the Citicorp notes was motivated by the pursuit of the tax advantages of a contingent installment sale rather than by a need for an interim investment pending its acquisition of Colgate debt. See 73 T.C.M. at 2227-29.

b. Hedge Against Interest Rate Risk

The Tax Court also rejected ACM's contention that it invested in LIBOR notes not only because they generated the contingent payments necessary to trigger the application of the ratable basis recovery rule, but also because they were an appropriate hedge against the interest rate exposure brought about by ACM's investment in Colgate debt issues. As the court explained, ACM's asserted rationale of hedging against other assets within the partnership would "defeat [the] very purpose" which Colgate had advanced for pursuing a debt acquisition partnership in the first instance. 73 T.C.M. at 2222. The court accurately noted that Colgate had entered into the partnership based on a prediction of falling interest rates and had justified its plan to acquire fixed-rate Colgate debt issues on the grounds that as interest rates declined, these issues would appreciate in value to ACM as the obligee, thus offsetting, through Colgate's share in ACM, the increased burdens that Colgate effectively would sustain as the obligor on those instruments if market interest rates fell further below the fixed rate established on these

49

obligations. See 73 T.C.M. at 2192-93, 2221-25; app. at 311, 666-68, 880-82, 2762-63, 2765, 2769-70.

While the acquisition of Colgate debt furthered this professed goal of decreasing the exposure associated with Colgate's fixed rate long term debt structure outside of the partnership, the acquisition of the LIBOR notes, whose value would decline as interest rates declined, conversely increased ACM's exposure to falling interest rates, offsetting the desired effect of the debt acquisition program which purportedly was a fundamental partnership objective. See

T.C.M. at 2221; app. at 311. Accordingly, the LIBOR notes, by hedging against the Colgate debt issues acquired within the partnership, negated the potential benefit of ACM's acquisition of these issues as a hedge against Colgate's interest rate exposure outside the partnership.

The fact that the interest rate exposure resulting from the LIBOR notes undermined rather than furthered the partnership's purported debt management objectives is also evident from the fact that Colgate reserved the option under the partnership agreement to elect to increase its share in changes in the value of the Colgate debt issues attributable to fluctuations in market interest rates, and exercised this option on several occasions. See app. at 101. Because the value of the fixed-rate Colgate debt issues increased in inverse proportion to interest rates, Colgate's exercise of this option reflects a prediction of falling interest rates which would result in risk to Colgate through its liabilities outside the partnership but would benefit Colgate through its interest in the assets held within the partnership. The acquisition of LIBOR notes, whose value depended in direct proportion on interest rates, effectively would dilute the benefits which the partnership was intended to yield and which Colgate sought to maximize by exercising its options under the partnership agreement. Thus, we find considerable support in the record for the Tax Court's conclusion that the acquisition of the LIBOR notes operated to "defeat [the] very purpose" which ACM had advanced as a tax-independent justification for its sequence of investments.

Although ACM meticulously set forth, in contemporaneously recorded documents, tax-independent

50

rationales for each of its transactions with respect to the Citicorp notes and LIBOR notes,46 these stated rationales cannot withstand scrutiny in light of the stated purposes behind the partnership itself, because the investment in the Citicorp notes impeded rather than advanced ACM's professed goal of making its cash available to acquire Colgate debt issues, just as the investment in the LIBOR notes impeded rather than advanced the professed goal of acquiring partnership assets that would hedge against Colgate's exposure to declining interest rates outside the partnership.47 Accordingly, wefind no error in the Tax Court's determination that the transactions "served no useful non-tax purpose," 73 T.C.M. at 2229, and thus constituted the type of scheme with "no purpose other than tax avoidance" that lacks the economic substance necessary to give rise to a deductible loss. Wexler, 31 F.3d

_____

46. See app. at 386–87 (authorizing investment in "private placement" notes as an investment "pending the acquisition" of Colgate debt issues); app. at 391 (recommending sale of Citicorp notes to generate cash needed to acquire Colgate debt and acquisition of LIBOR notes to hedge risks associated with Colgate debt); app. at 397 (advising reduction of LIBOR note holdings in light of reduced need for hedging within partnership); app. at 408–09 (recommending disposition of remaining "highly volatile" LIBOR notes in light of Colgate's increased partnership interest which eliminated need for hedge within partnership).

47. The rationales set forth in ACM's contemporaneous records are particularly implausible in light of the documents prepared between May and October 1989, before ACM's formation, which propose an identical sequence of transactions far in advance of the events which, according to memoranda and minutes recorded during the operation of the partnership, prompted each ensuing step in the series of transactions. See 71 T.C.M. at 2191; app. at 678–79, 275–79, 310–21, 296–308.

48. While ACM purported to combine the tax avoidance objectives of Merrill Lynch's initial May 1989 proposal with the non-tax debt acquisition objectives incorporated into subsequent proposals, ACM's pursuit of these two distinct objectives within the same partnership cannot obscure the fact that the contingent installment exchange, which was solely responsible for the tax consequences at issue, was executed independently of, did not further, and in fact impeded ACM's pursuit of its non-tax debt acquisition objectives, because the Citicorp notes placed the cash needed to acquire Colgate debt into illiquid instruments whose

51

c. Anticipated Profitability

In addition to rejecting ACM's asserted non-tax justifications for its sequence of investments and dispositions, the Tax Court also rejected ACM's contention that its transactions were reasonably expected to yield a pre-tax profit because the court found ACM had planned and executed its transactions without regard to their pre-tax economic consequences. See 73 T.C.M. at 2217–21. The evidence in the record overwhelmingly supports this conclusion.49 The documents outlining the proposed transactions, while quite detailed in their explication of expected tax consequences, are devoid of such detailed projections as to the expected rate of return on the private placement notes and contingent payment notes that were essential components of each proposal. See 73 T.C.M. at 2191; app. at 678–79, 263–79, 296–308.50

Moreover, ACM's partners were aware before they entered

the partnership that the planned sequence of investments
would entail over $3 million in transaction costs. See app.
_____

disposition cost ACM several million dollars in transaction costs while
the purchase of the LIBOR notes increased exposure to falling interest
rates, diminishing the desired effects of the debt acquisition strategy.
Thus, the non-tax motivations behind ACM's debt purchase do not alter
the fact that the contingent installment sale was motivated only by tax
avoidance purposes.

49. ACM, citing Sacks v. Commissioner, 69 F.3d 982, 991 (9th Cir. 1995),
argues that a transaction need not be profitable in order to be respected
for tax purposes. See br. at 24 & n.30. Sacks, however, held that,
"[w]here a transaction has economic substance, it does not become a
sham merely because it is likely to be unprofitable on a pre-tax basis,"
and found that the transaction had economic substance because it
involved a sale and leaseback of equipment used for legitimate business
purposes and it resulted in concrete changes in the parties' economic
positions. See 69 F.3d at 990-92. Thus, Sacks is inapposite in this case
where the contingent installment exchange served no non-tax business
purposes and did not materially alter ACM's economic position.

50. According to these documents, the capital gains realized in the first
year of the transaction would equal the aggregate capital losses realized
in the ensuing years, reflecting no net economic change. See app. at 279,
300-301, 305-08.

52

at 294. Yet Colgate, which effectively bore virtually all of
these costs pursuant to the terms of the partnership
agreement, did not attempt to assess whether the
transactions would be profitable after accounting for these
significant transaction costs. See 73 T.C.M. at 2217-18,
2204. Furthermore, while ACM planned to dispose of the
Citicorp notes after a brief holding period for an amount
equal to their purchase price, see app. at 275-77, 300, 321,
its proposed transactions contemplated holding for two
years the LIBOR notes whose principal value would decline
in the event of the falling interest rates which ACM's
partners predicted. See app. at 311, 753-55.

Thus, while the Citicorp note investment which was
essential to structuring the transaction as a contingent
installment sale was economically inconsequential, the
LIBOR note investment which was equally essential to
achieving the desired tax structure was economically
disadvantageous under the market conditions which
Colgate predicted and which actually transpired. ACM's
lack of regard for the relative costs and benefits of the
contemplated transaction and its failure to conduct a

contemporaneous profitability analysis support the Tax
Court's conclusion that ACM's transactions were not
designed or reasonably anticipated to yield a pre-tax profit,
particularly in view of the significant transactions costs
involved in exchanging illiquid private placement
instruments. See Hines v. United States, 912 F.2d 736, 739
(4th Cir. 1990).51

---

51. ACM, citing its expert's opinion that ACM could have earned a profit
at market interest rates of 8%, see br. at 38 & n.47, contends that the
Tax Court erred in concluding that ACM could not have expected to earn
a profit from its transactions "under any reasonable forecast of future
interest rates." 73 T.C.M. at 2219. However, in assessing the anticipated
profitability of a transaction, tax courts properly may disregard
computations, such as those presented by ACM's expert, that were
prepared in the context of the litigation and which "had not entered into
[the taxpayer's] calculations at the outset" of the transaction.
Goldstein,
364 F.2d at 740. Because nothing in the record resembles a profitability
calculation conducted at the inception of the transaction, we find no
error in the Tax Court's determination that ACM's transactions were not
designed to generate a profit.

53

In light of the Tax Court's well-founded conclusion that
Colgate and ACM expected interest rates to decline,
rendering the proposed transactions unprofitable, we find it
immaterial whether, as ACM contends, the court overstated
the degree to which interest rates would have had to rise in
order for ACM to recover its transaction costs. See br. at
42-43. Even accepting ACM's assertion that it could have
recovered its costs upon a significantly smaller rise in
interest rates than that calculated by the Tax Court, this
assertion is immaterial in the event of falling interest rates
and at best demonstrates a prospect of a nominal,
incidental pre-tax profit which would not support a finding
that the transaction was designed to serve a non-tax profit
motive. See Sheldon v. Commissioner, 94 T.C. 738, 768
(1990).52

Furthermore, we find no merit in ACM's assertion that
the Tax Court improperly based its determination that the
transactions were unprofitable for Colgate on the erroneous
assumption that Colgate, directly and through
Southampton, "would continue to own only 17 percent of
ACM's assets," causing it to understate the profits Colgate
would receive toward the end of the transactions when it
would own 99.7% of the partnership. See br. at 39.53 As

---

52. Similarly, the evidence that neither Colgate nor ACM reasonably expected to gain any pretax profit from the transaction or even attempted to formulate a profitability projection compels us to reject ACM's contention that the Tax Court's profitability analysis improperly rested on a finding that ACM could have made greater profits with less risk by pursuing alternative investments. See br. at 46. While Lemmen v. Commissioner, 77 T.C. 1326, 1346 n.29 (1981), on which ACM relies, emphasized that a business venture may constitute an activity engaged in for profit within the meaning of I.R.C. S 183 even when other types of ventures may have been more profitable, this proposition does not preclude the Tax Court from considering, in its analysis of whether there was a profit motive behind ACM's transactions, that the decision to exchange Citicorp notes for LIBOR notes involved substantial transaction costs, entailed significant risks given the anticipated falling interest rates, and compared unfavorably to the higher profitability and lower risk of the 8.75% cash deposit accounts which ACM affirmatively relinquished to pursue this strategy.

53. ACM contends that the Tax Court erred by examining the transactions' anticipated profitability from Colgate's perspective, contrary

54

discussed above, however, neither ACM nor any of its partners reasonably anticipated any profits resulting from the relevant transactions, which entailed an economically inconsequential investment in Citicorp notes and a decidedly unprofitable investment in LIBOR notes whose value would be expected to decline under contemporaneously predicted market conditions. Because the contingent installment exchange transaction, as contemplated and as actually executed, yielded no partnership profits in any amount, Colgate's percentage share of those non-existent profits is immaterial.54

Even assuming, however, that ACM and its partners expected to earn some measure of profits upon disposition of the BOT LIBOR notes, any additional portion of these profits that would redound to Colgate's benefit due to its increased share in the partnership cannot be characterized as an additional return on Colgate's investment in

_____

to the principle that the expected profitability of partnership transactions
must be determined "at the partnership level, rather than at the level of the partners." Br. at 36. However, as we explained in Simon v. Commissioner, 830 F.2d 499, 507 (3d Cir. 1987),

    [a]lthough the existence of a profit objective of a partnership is

determined at the partnership level, . . . a partnership is merely a

formal entity, and a determination of profit objective can only be made with reference to the actions of those . . . who manage the partnership affairs. . . . . [Therefore] the Tax Court did not misapply the profit objective test at the partnership level by looking to the motives and actions of those individuals that organized, structured and conducted [partnership] operations.

In this case where ACM and its transactions were structured around Colgate's objectives and where Colgate was to hold a 99.7% stake in any eventual partnership profits, see 73 T.C.M. at 2190–97, 2217–19, 2221, we find no error in the Tax Court's examination of Colgate's prospects for profit as a means of analyzing ACM's prospects for profit.

54. ACM argues, br. at 9, that each of ACM's partners realized a positive pre-tax return on its investment in ACM. However, we reject ACM's attempt to equate net partnership profits with profits resulting from the contingent installment exchange which gave rise to the tax consequences at issue and which the Tax Court properly found, based on ample evidence in the record, was not reasonably anticipated to generate a profit. See 73 T.C.M. at 2218–19.

55

partnership assets because Colgate, directly and through Southampton, paid well over $100 million to acquire its increased partnership interest. See app. at 137, 769–70.55 These additional contributions far exceeded Colgate's initial partnership investment of $35 million, undermining ACM's assertion that any additional returns attributable to Colgate's increased stake in the partnership properly may be characterized as further returns on Colgate's interest in the partnership's investments. Thus, we are unpersuaded by ACM's contention that the Tax Court distorted its profitability analysis by failing to account for Colgate's increased partnership interest.

ACM also argues that the Tax Court's profitability analysis was flawed because the court adjusted the income expected to be generated by the LIBOR notes to its net present value. See br. at 43. In support of its assertion that this net present value adjustment constitutes reversible error, ACM cites Estate of Thomas v. Commissioner, 84 T.C. 412 (1985), which noted that the issue of present value adjustments was "not raised or briefed by the parties" and held that absent some statutory guidance, it would not discount the residual value of obsolete partnership assets at the time of obsolescence to their equivalent present values at the time the partnership was formed. The court

reasoned that discounting to present value effectively would require that the taxpayer's investment yield a rate of return exceeding the discount rate which, the court found, would contravene the admonition in Treas. Reg. S 1.183-2(b)(9) that "the availability of other investments which would yield a higher return, or which would be more likely to be profitable, is not evidence that an activity is not engaged in for profit" within the meaning of I.R.C. S 183. See 84 T.C. at 440 n.52.

We reject ACM's contention that Estate of Thomas, which

_____

55. On June 25, 1991, Colgate paid Kannex $85,897,203 and Southampton paid Kannex $15 million to purchase a portion of Kannex's share in the partnership. On November 27, 1991, ACM redeemed Kannex's remaining partnership interest at a cost of $100,775,915 which Colgate borrowed against the partnership assets it was to acquire. See app. at 137, 769-70.

56

construed Treasury Regulations under I.R.C. S 183, precludes present value adjustments in the prospect-for-profit analysis under the judicially created economic substance doctrine.56 In transactions that are designed to yield deferred rather than immediate returns, present value adjustments are, as the courts have recognized, an appropriate means of assessing the transaction's actual and anticipated economic effects. See, e.g., Hilton v. Commissioner, 671 F.2d 316, 317 (9th Cir. 1982) (affirming economic substance determination based on present value analysis of taxpayer's investments); Citizens & Southern Corp. v. Commissioner, 91 T.C. 463, 498 (1988) (noting that value of an acquired asset may be determined based on future income likely to be generated that by that asset discounted to present value), aff'd, 919 F.2d 1992 (11th Cir. 1990); Gianaris v. Commissioner, 64 T.C.M. (CCH) 1229, 1234 (1992) ("we have consistently discounted . . . income streams produced by [an investment] in determining whether the taxpayer had a profit objective") (citations omitted).

We find no basis in the law for precluding a tax court's reliance on a present value adjustment where such an adjustment, under the surrounding circumstances, will serve as an accurate gauge of the reasonably expected economic consequences of the transaction. In this case where ACM's transactions essentially converted readily available cash, with only a brief interim investment in the Citicorp notes, into a stream of deferred payments, we find that the present value adjustment played an appropriate

_____

56. ACM also cites City of New York v. Commissioner, 103 T.C. 481, 487
(1994), aff 'd, 70 F.3d 142 (D.C. Cir. 1995), which analyzed whether
I.R.C. S 141, in setting forth statutory distinctions based on the amount
of bond proceeds forwarded to private parties, referred to these amounts
in absolute terms or as adjusted to present value. The court concluded
that "time value of money concepts can be applied only in the presence
of a legislative directive to do so" and found no indication that Congress
intended to refer to adjusted amounts. Id. (citation omitted). Because the
issue of whether to imply a net present value adjustment in an amount
specified in the Internal Revenue Code is distinct from the issue of
whether to consider net present value as a variable in a profitability
analysis under the economic substance doctrine, wefind City of New
York inapposite.

57

role in the Tax Court's analysis of the potential profitability
of the transactions. We accordingly find no error in this
aspect of the court's analysis.

ACM also avers that the Tax Court erred in excluding
from its profitability analysis "the pre-tax income resulting
from the investment of $140 million of cash received as
part of the consideration for the Citicorp Notes." Br. at 44.
We disagree. The Tax Court properly analyzed the
profitability of the transactions whose economic substance
is at issue, namely the contingent installment exchange of
Citicorp notes for LIBOR notes which gave rise to the
disputed tax consequences. Any profits arising from ACM's
investment of $140 million in cash into Colgate debt issues
did not result from the contingent installment exchange
whose economic substance is in issue. Because this sum of
cash in fact represents the portion of the proceeds from the
Citicorp notes which ACM did not invest in the contingent
installment exchange of the other $35 million in Citicorp
notes for contingent-payment LIBOR notes, any profits
derived from these funds cannot be characterized as profits
arising from the contingent installment exchange. Thus, the
Tax Court properly excluded these profits from its analysis
of the profitability of the contingent installment sale which
gave rise to the disputed capital losses.57 We find ample

_____

57. For similar reasons, we reject ACM's contention, see br. at 45, that
the Tax Court erroneously excluded from its profitability analysis the
gains derived from the portion of the Citicorp notes which ACM held
until October 1991 instead of exchanging them for LIBOR notes. These
notes, like the $140 million cash proceeds of the Citicorp note
disposition, were not involved in the exchange for contingent-payment
notes. Thus, any profits generated thereby may not be considered to be

profits arising from the contingent installment sale. In fact, the profitability of holding the Citicorp notes until 1991 when they could be tendered to the issuer at par, ensuring recovery of their principal value, only highlights the lack of reasonably anticipated profitability in exchanging these notes for the LIBOR notes whose principal value was at risk in the projected declining interest rate market. We also are unpersuaded by ACM's contention, see id., that the Tax Court, having excluded from its profitability analysis the gains from the Citicorp notes held until 1991, erred by failing to exclude from its calculations a portion of the transaction costs arising from the partnership transactions

58

support in the record for the Tax Court's conclusion that ACM and its partners did not reasonably anticipate that its contingent installment sale would generate a pre-tax profit. Because ACM's acquisition and disposition of the Citicorp notes in a contingent installment exchange was without objective effect on ACM's net economic position or non-tax objectives, and because its investments in the Citicorp notes and LIBOR notes did not rationally serve ACM's professed non-tax objectives or afford ACM or its partners a reasonable prospect for pre-tax profit, we will affirm the Tax Court's determination that the contingent installment exchange transactions lacked economic substance and its resulting decision providing that the capital gain and loss at issue will not be recognized and thus disallowing deductions arising from the application of the contingent installment sale provisions and the ratable basis recovery rule.

B. Actual Economic Losses

Following the entry of the Tax Court's opinion holding that ACM's contingent installment sale did not have sufficient economic substance to be recognized for tax purposes, the parties submitted memoranda pursuant to

_____

as a whole. See id. Even if we were to subtract the 15% pro rata portion of the transaction costs that ACM suggests were attributable to the 15% of ACM's $205 million in Citicorp notes which were not exchanged in the contingent sale, the resulting increase in the net yield from ACM's transactions, totaling under $0.5 million, would not support the conclusion that these transactions portended a reasonable prospect for profit, particularly in light of the evidence that ACM and its partners made no attempt to assess the transactions' profitability after transaction costs. In any event, the Tax Court properly declined to allocate a pro rata portion of the overall transaction costs to the portion
of the Citicorp notes which were put to Citicorp at par in 1991, because the most significant portion of the transaction costs arose in the course

of negotiating the structured transaction and bid-ask spread required to market the illiquid private placement notes to third parties in the contingent installment exchange and to remarket the LIBOR notes, and thus was not properly attributable to the notes which ACM retained and put to Citicorp in 1991.

59

Tax Court Rule 155 regarding the proper computation of tax liabilities to be allocated by ACM pursuant to that opinion. ACM argued that even if it was not entitled to deduct the entire $84,997,111 in tax losses it had reported, it was entitled to deduct the approximately $6 million "portion of its loss that is not attributable to the installment sale accounting and that reflects the actual economics of the transactions in issue." App. at 3386; see also app. at 3348-51, 3385-98. The court rejected ACM's argument and entered a final decision disallowing all deductions arising from ACM's transactions as well as the 1989 capital gain. See app. at 3444. ACM contends that the Tax Court erroneously failed to recognize that ACM's ownership of the LIBOR notes had economic substance even if the contingent installment sale did not, and thus improperly disallowed deductions arising from its ownership of those notes, resulting in inconsistent tax treatment in light of ACM's reporting of the income generated by those notes.[58] We agree.

In Lerman, 939 F.2d at 45, we held that a transaction that lacks economic substance "simply is not recognized for federal taxation purposes, for better or for worse," and we are not aware of any cases applying the economic substance doctrine selectively to recognize the consequences of a taxpayer's actions for some tax purposes but not others. Rather, the courts have applied economic substance principles to "give effect either to both the cost and the income functions [of a transaction], or to neither." Seykota v. Commissioner, 62 T.C.M. (CCH) 1116, 1118 (1991); accord Sheldon, 94 T.C. at 762 (denying interest deduction and accordingly holding that income items should not be recognized); Arrowhead Mountain Getaway,

───────────────────────────────────────────────

58. Contrary to the Commissioner's suggestion, br. at 49, ACM adequately raised before the Tax Court its contention that, as gain from the LIBOR notes was recognized, it was entitled to deduct the corresponding economic losses on those notes. See app. at 3386 ("[d]isallowing the loss from the sale of the LIBOR Notes would be inconsistent with recognizing the income from the payments under the Notes"); id. at 3390 (arguing that Commissioner "should not be permitted to . . . cause the recognition of . . . income and then disregard the same transactions in order to deny a loss").

Ltd. v. Commissioner, 69 T.C.M. (CCH) 1805, 1822 (1995) (holding that because transactions were economic shams that could not give rise to deductions, amounts received in the course of those transactions could not be characterized as taxable income), aff'd, 119 F.3d 80 (9th Cir. 1997) (table). Thus, we must set aside the Tax Court's decision to the extent that it disallowed the deduction of all losses, including actual economic losses, associated with the LIBOR notes without adjusting for the taxes paid on the approximately $2.3 million of interest income generated by the same notes. See app. at 3444, 3390.

While it is clear that the income and loss aspects of the LIBOR notes must be treated consistently with one another, this proposition does not resolve whether the consistency should be achieved by disregarding the tax consequences of the income generated by the notes or by permitting the deduction of actual economic losses associated with the notes. ACM urges us to adopt the latter position and in support thereof invokes Wexler, 31 F.3d at 127, in which we held that "in some circumstances, a sham transaction may have separable, economically substantive, elements that give rise to deductible interest obligations." According to ACM, br. at 48, its ownership of the BOT LIBOR notes and its 1991 disposition thereof for an actual economic loss gave rise to a separable, economically substantive loss that is properly deductible under Wexler because it is distinct from the losses resulting from the ratable basis recovery rule. The Commissioner, on the other hand, contends that Wexler does not permit the deduction of ACM's economic losses on the LIBOR notes because, according to the Commissioner's interpretation of Wexler, a separable item of loss is not deductible unless the underlying transaction had a potential non-tax benefit. See br. at 48-49.

For the following reasons, we find ACM's contentions to be more persuasive. In Wexler, the taxpayer invoked Rice's Toyota, 752 F.2d at 95-96, which disallowed depreciation and interest deductions arising from a transaction that was a sham in that the taxpayer "subjectively lacked a business purpose and the transaction objectively lacked economic substance." The court found, however, that one discrete portion of the transaction, which entailed the exchange of

a recourse note for "something of economic value," had

sufficient economic substance to give rise to an interest deduction. Id. at 95-96. Distinguishing Rice's Toyota, we found that the claimed deductions in Wexler did not constitute such a "separable, economically substantive" item that was distinct from the sham aspects of the transaction, but rather constituted "the principal tax benefits of the transaction." Wexler, 31 F.3d at 125. Thus, we found, allowance of the deduction would have permitted the taxpayer "to reap the entire benefit of its sham transaction" by allowing him the deduction "that was the centerpiece of the whole scheme." Id. at 127.

Such is not the case here. The actual economic losses associated with ACM's ownership of the LIBOR notes are both economically substantive and separable from the sham aspects of the underlying transaction. Far from being the "centerpiece" or "principal tax benefit" of the underlying transaction, the approximately $6 million in economic losses which ACM seeks to deduct were separate and distinct from the $87 million tax loss that did not correspond to any actual economic loss but rather was an artifact of the ratable basis recovery rule which inflated the tax basis of the LIBOR notes well above their actual cost basis. In contrast to its economically inconsequential acquisition and disposition of the Citicorp notes, ACM's ownership of the BOT LIBOR notes, which extended over two years under circumstances that posed an actual risk to the principal value of that investment, had an economically substantive impact on ACM's net financial position. In these circumstances, recognition of both the income and the loss aspects of ACM's investment in those notes will result in consistent tax treatment which accurately reflects the economic reality of ACM's transactions and will allow deduction only of a "separable, economically substantive" item that is not the "centerpiece" of the transactions, consistently with our holding in Wexler.

While the Commissioner, br. at 48, urges us to read Wexler more broadly to preclude any deductions associated with an underlying transaction found to be a sham, we decline to do so. We recognize that Wexler not only distinguished Rice's Toyota on its facts, but also criticized

62

its reasoning. In doing so, however, Wexler did not criticize Rice's Toyota's essential holding that "in some circumstances, a sham transaction may have separable, economically substantive elements that give rise to deductible" liabilities, see 31 F.3d at 127, but rather disagreed with the Rice's Toyota court'sfinding that the recourse note portion of the transaction, which the court

had described as "a `fee' for purchase of expected tax benefits," had economic substance. As we explained in Wexler, by the Rice's Toyota court's own description, that transaction had no non-tax consequences and served no non-tax purposes and thus could not be considered economically substantive even if it was separable from the central aspects of the underlying sham. See Wexler, 31 F.3d at 125 (quoting Rice's Toyota, 752 F.2d at 94).

ACM's possession of the LIBOR notes, although not intended to serve non-tax purposes, had significant non-tax economic effects, consisting of several million dollars in actual economic losses. As we acknowledged in Wexler, even where a transaction is not intended to serve business purposes, it may give rise to a deduction to the extent that it has objective economic consequences apart from tax benefits. See 31 F.3d at 126 (citing Jacobson, 915 F.2d at 849); see also Gregory, 293 U.S. at 469, 55 S.Ct. at 267 (holding that if the transaction "in reality was effected" in substance as well as in form, "the ulterior [tax avoidance] purposes . . . will be disregarded); Northern Indiana Pub. Serv. Co., 115 F.3d at 512 (holding that Gregory and its progency "do not allow the Commissioner to disregard economic transactions . . . which result in actual, non-tax-related changes in economic position" regardless of "tax-avoidance motive"). Thus, we are unpersuaded by the Commissioner's assertion that Wexler requires us to disregard actual, objective economic losses merely because they are incidental to a broader series of transactions that are found to constitute an economic sham whose principal tax benefits must be denied. See br. at 48-49. Because ACM's possession and disposition of the LIBOR notes was distinct from the contingent installment exchange which constituted the underlying sham transaction and because this distinct portion of the transaction had sufficient non-tax economic effect to be recognized as economically

63

substantive, we find that this aspect of ACM's transactions gave rise to the type of "separable, economically substantive" loss that is deductible even when incurred in the context of a broader transaction that constitutes an economic sham. Wexler, 31 F.3d at 127. Accordingly, we will reverse the Tax Court's decision to the extent that it disallowed the deductions arising from the actual economic losses which ACM sustained upon its disposition of the LIBOR notes.

IV. CONCLUSION

For the foregoing reasons, we will affirm the Tax Court's

application of the economic substance doctrine and its resulting decision eliminating the capital gains and losses attributable to ACM's application of the contingent installment sale provisions and the ratable basis recovery rule. The Commissioner's cross appeal is moot and thus will be dismissed. We will, however, reverse the Tax Court's decision insofar as it disallowed the deductions arising from the actual economic losses associated with ACM's ownership of the LIBOR notes, and will remand to the Tax Court for entry of a decision consistent with this opinion. The parties will bear their own costs on this appeal.

64

McKEE, Circuit Judge, dissenting.

By finding that ACM's sales of the Citicorp notes for cash and LIBOR Notes "satisfied each requirement of the contingent installment sales provisions and the ratable basis recovery rule," Maj. Op. at 28, yet, simultaneously subjecting these transactions to an economic substance and sham transaction analysis, the majority has ignored the plain language of IRC S 1001, and controlling Supreme Court precedent. We have injected the "economic substance" analysis into an inquiry where it does not belong. Therefore, I respectfully dissent.

ACM, like all taxpayers, has the absolute right to decrease or to avoid the payment of taxes so long as that goal is achieved legally. Gregory v. Helvering, 293 U.S. 465, 468 (1935). Id. In Gregory, the taxpayer wanted to transfer stock from her wholly-owned corporation to herself, but realized that a direct distribution of those shares would be a taxable event. Therefore, in an attempt to avoid a taxable event, the taxpayer created a new corporation, transferred the stock to that new corporation, and then caused the new corporation to distribute the stock to her in liquidation. The taxpayer owned all of the stock of United Mortgage Corporation, and that corporation owned 1000 shares of the Monitor Securities Corporation that the taxpayer wanted to obtain. In order to do so without paying the taxes that would clearly be due on a direct transfer, she engineered a purported reorganization of United Mortgage Corporation. The Supreme Court described her scheme as follows:

> To that end, she caused the Averill Corporation to be organized under the laws of Delaware on September 18, 1928. Three days later, the United Mortgage Corporation transferred to the Averill Corporation the 1,000 shares of Monitor stock, for which all the shares of the Averill Corporation were issued to the petitioner.

> On September 24, the Averill Corporation was
> dissolved, and liquidated by distributing all its assets,
> namely, the Monitor shares, to the petitioner. No other
> business was ever transacted, or intended to be
> transacted, by that company. The petitioner
> immediately sold the Monitor shares. . . .

65

Gregory, 293 U.S. at 467 (emphasis added). At the time, 26
USCA S 112 (g) exempted the gain realized from a corporate
reorganization "[i]f there is distributed, in pursuance of a
plan of reorganization, to a shareholder, . . . stock . . . in
such corporation." Id. at 468. Most significantly for our
purposes, the Court stated the issue as follows: "[b]ut the
question for determination is whether what was done, apart
from the tax motive, was the thing which the statute
intended." Id. at 469. The Court concluded that what was
done was not what the statute intended because the
liquidation was not a plan of reorganization at all, but "a
transfer of assets by one corporation to another in
pursuance of a plan having no relation to the business of
either. . . ." Id. Accordingly, the Court disregarded the
transaction, even though the form of the transaction
satisfied the literal requirements of the IRC's reorganization
provisions, because it found that the entire transaction was
nothing but "an elaborate and devious form of conveyance
masquerading as a corporate reorganization, and nothing
else." Id. at 470. In other words, the transaction was one
which "upon its face lies outside the plain intent of the
statute." Id. Consequently, "the rule which excludes from
consideration the motive of tax avoidance" did not apply. Id.

Accordingly, I am not as persuaded as my colleagues that
Gregory should guide our inquiry into these transactions.
Here, the sales of the Citicorp Notes for cash and LIBOR
Notes were clearly "legitimate" sales in the nontax sense.
Under IRC S 1001, the tax consequences of a gain or loss in
the value of property are deferred until the taxpayer realizes
the gain or loss. Cottage Savings Assoc. v. Commissioner,
499 U.S. 554, 559 (1991). The concept of "realization" is
implicit in IRC S 1001(a), Id., and the realized gain is
recognized when the property is sold or exchanged. IRC
S 1001(c).1 In Cottage Savings, the Court held that a sale or
exchange of property is a realization event "so long as the
exchanged properties are `materially different' -- that is, so

_____

1. IRC S 1001(c) provides: "(c) Recognition of Gain or Loss. -- Except as
otherwise provided in this subtitle, the entire amount of the gain or
loss,
determined under this section, on the sale or exchange of property, shall

be recognized."

long as they embody legally distinct entitlements.' Id. at 566.

> Cottage Savings sold 90% participation in 252 mortgages to four S&L's. It simultaneously purchased 90% participation interests in 305 mortgages held by these S&L's. All of the loans involved in the transaction were secured by single-family homes. . . .
>
> On its 1980 federal income tax return, Cottage Savings claimed a deduction . . . which represented the adjusted difference between the face value of the participation interests that it traded and the fair market value of the participation interests it received. . . .

Cottage Savings, 499 U.S. at 557. It was not disputed that "[t]he . . . acknowledged purpose [of the transfers] was to facilitate transactions that would generate tax losses but that would not substantially affect the economic position of the transacting S&L's". Id. at 556. In allowing the taxpayer to deduct the resulting loss the Court reasoned that S 1001 did not recognize exchanges "commonly known as `like kind', and that Congress therefore intended to afford tax recognition of gains and losses resulting from exchanges of property that was materially different." Id., at 564. The Court held "[u]nder our interpretation of S 1001(a), an exchange of property gives rise to a realization event so long as the exchanged properties are `materially different' -- that is, so long as they embody legally distinct entitlements." Id. That is what happened here, and I believe that, under Cottage Savings, the tax loss here should have been allowed.

ACM's sales of the Citicorp Notes for cash and LIBOR Notes resulted in the exchange of materially different property with "legally distinct entitlements.". Consequently, the sales were substantive dispositions, and the tax effects of those transactions should be recognized. Cottage Savings, as well as the plain language of IRC S 1001, demands that result.

Thus, I do not think that the many cases decided before Cottage Savings that the majority relies upon are helpful. e.g., Maj. Op. at 26-34. Similarly, I do not believe our

inquiry is furthered by discussing United States v. Wexler, 31 F.3d 117 (3rd Cir. 1994). See Maj. Op. at 45. There, we were not addressing the issue of sham transactions in the context presented here, nor did we cite Cottage Savings. We did cite Lerman v. Commissioner, 939 F.2d 44, 45 (3d Cir. 1991), and we noted that, in Lerman, we said " `economic substance is a prerequisite to any Code provision allowing deductions.' " 31 F.3d at 127 (quoting Lerman, 939 F.2d at 48 & n. 6, 52). However, it is the definition of "economic substance" that is the sticking point. Here, the "economic substance" inquiry must be governed by the "material difference requirement" of Cottage Savings, not by the tax avoidance intent of the taxpayers.

In this regard, I believe the majority mischaracterizes the appellant's argument. The majority states: "ACM acknowledges that even where the `form of the taxpayer's activities indisputably satisfie[s] the literal requirements' of the statutory language, the courts must examine `whether the substance of those transactions was consistent with their form' ". Maj. Op. at 29 (quoting Appellant's Br. at 21). However, ACM is referring to the issue as posed by Gregory v. Helvering. In referring to the facts of that case, ACM argues:

> The form of the taxpayer's activities indisputably satisfied the literal requirements of the Code's reorganization provisions, but the question was whether the substance of those transactions was consistent with their form. As he does here, the Commissioner argued in Gregory that the taxpayer's ulterior purpose should be disregarded. . . .
>
> In other words, the focus should be on the substance of what was done, and not on why it was done. The Supreme Court then analyzed the specific statutory language concerning reorganizations and concluded that the taxpayer's actions lay outside the plain intent of the statute.

Appellant's Br. at 21.

As recited earlier, ACM's sales of the Citicorp Notes for cash and LIBOR Notes resulted in the exchange of materially different property. I believe our inquiry should

68

proceed no further, and reverse the holding of the Tax Court eliminating the capital gains and losses attributable

to ACM's application of the contingent installment sale provisions and the ratable basis recovery rule to its disposition of the Citicorp Notes.

I can't help but suspect that the majority's conclusion to the contrary is, in its essence, something akin to a"smell test." If the scheme in question smells bad, the intent to avoid taxes defines the result as we do not want the taxpayer to "put one over." However, the issue clearly is not whether ACM put one over on the Commissioner, or used LIBOR notes to "pull the wool over his eyes." The issue is whether what ACM did qualifies for the tax treatment it seeks under S 1001. The fact that ACM may have"put one over" in crafting these transactions ought not to influence our inquiry. Our inquiry is cerebral, not visceral. To the extent that the Commissioner is offended by these transactions he should address Congress and/or the rulemaking process, and not the courts.2

Accordingly I must dissent from what I admit is a very finely crafted opinion by my colleague, Judge Greenberg.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit
_____

2. As the majority notes, the Commissioner apparently realized the possible "loophole" in the regulations and enacted Treas. Reg. S 1.701-2(a) in an apparent effort to curb such tax driven transactions as the ones here. See Maj. Op. at 29-30, n. 29.

69